# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF TEXAS AND
TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY,

    *Petitioners,*

v.

UNITED STATES
ENVIRONMENTAL
PROTECTION AGENCY AND
LEE M. ZELDIN,
ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,

    *Respondents.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 25-1096

# PETITION FOR REVIEW

In accordance with 42 U.S.C. § 7607(b)(1), Federal Rule of Appellate Procedure 15, and D.C. Circuit Rule 15(a)(1), Petitioners the State of Texas and the Texas Commission on Environmental Quality hereby petition this Court for review of the final action taken by Respondents United States Environmental Protection Agency and Lee M. Zeldin, Administrator, United States Environmental Protection Agency, entitled "State Implementation Plan Submittal Deadlines and Implementation Requirements for Reclassified Nonattainment Areas Under the Ozone National Ambient Air Quality Standards," (attached hereto), published at 90 Fed. Reg. 67,864 (Jan. 17, 2025).

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

/s/ Kateland R. Jackson
KATELAND R. JACKSON
Assistant Solicitor General
Kateland.Jackson@oag.texas.gov

Counsel for Petitioners State of Texas
and Texas Commission on Environ-
mental Quality

## Certificate of Service

I hereby certify that I caused a true and correct copy of this Petition for Review to be served on March 18, 2025, by United States first-class mail on the following:

Lee M. Zeldin, Administrator
United States Environmental Protection Agency
Office of the Administrator
Mail Code 1101A
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Office of General Counsel
United States Environmental Protection Agency
Mail Code 2310A
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

The Honorable Pamela Jo Bondi
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

/s/ Kateland R. Jackson
Kateland R. Jackson

## PART 233—INSPECTION SERVICE AUTHORITY

■ 1. The authority citation for part 233 continues to read as follows:

**Authority:** 39 U.S.C. 101, 102, 202, 204, 401, 402, 403, 404, 406, 410, 411, 1003, 3005(e)(1), 3012, 3017, 3018; 12 U.S.C. 3401–3422; 18 U.S.C. 981, 983, 1956, 1957, 2254, 3061; 21 U.S.C. 881; Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note); Pub. L. 104–208, 110 Stat. 3009; Secs. 106 and 108, Pub. L. 106–168, 113 Stat. 1806 (39 U.S.C. 3012, 3017); Pub. L. 114–74, 129 Stat. 584.

### § 233.12 [Amended]

■ 2. In § 233.12:

■ a. In paragraph (a), remove "$88,412" and add in its place "$90,709", remove "$176,820" and add in its place "$181,414", remove "$17,683" and add in its place "$18,142", and remove "$3,536,422" and add in its place "$3,628,298".

■ b. In paragraph (b), remove "$44,206" and add in its place "$45,354", remove "$88,412" and add in its place "$90,709", remove "$8,842" and add in its place "$9,072", and remove "$1,768,212" and add in its place "$1,814,150".

■ c. In paragraph (c)(4), remove "$17,683" and add in its place "$18,142".

■ d. In paragraph (d), remove "$3,536,422" and add in its place "$3,628,298".

■ e. In paragraph (e), remove "$17,683" and add in its place "$18,142".

■ f. In paragraph (f), remove "$383" and add in its place "$393" and remove "$152,461" and add in its place "$156,422".

## PART 273—ADMINISTRATION OF PROGRAM FRAUD CIVIL REMEDIES ACT

■ 3. The authority citation for part 273 continues to read as follows:

**Authority:** 31 U.S.C. Chapter 38; 39 U.S.C. 401.

■ 4. In § 273.3:

■ a. In paragraph (a)(1)(iv), remove "$13,946" and add in its place "$14,308".

■ b. In paragraph (b)(1)(ii), remove "As adjusted under Public Law 114–74, the penalty is $13,946 per claim."

■ c. In paragraph (b)(1)(iii), add at the end of the paragraph "As adjusted under Public Law 114–74, the penalty is $14,308 for each such statement."

**Colleen Hibbert-Kapler,**

*Attorney, Ethics & Legal Compliance.*

[FR Doc. 2025–01062 Filed 1–16–25; 8:45 am]

**BILLING CODE 7710–12–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 51

**[EPA–HQ–OAR–2024–0333; FRL–11817–02–OAR]**

**RIN 2060–AW25**

### State Implementation Plan Submittal Deadlines and Implementation Requirements for Reclassified Nonattainment Areas Under the Ozone National Ambient Air Quality Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing deadlines for submission of state implementation plan (SIP) revisions and implementation of the relevant control requirements that will apply for nonattainment areas reclassified as Moderate, Serious, and Severe under the current and any future ozone National Ambient Air Quality Standards (NAAQS) as a result of either failing to attain the standard by the applicable classification attainment date or the EPA granting a voluntary reclassification request. This final rule articulates the implementation requirements and timeframes that will apply for all such areas once reclassified. The EPA is also finalizing regulatory revisions to codify its existing interpretation that following reclassification, a state is no longer required to submit SIP revisions addressing certain, but not all, requirements related to the prior classification level for an ozone nonattainment area.

**DATES:** This rule is effective on February 18, 2025.

**ADDRESSES:** The EPA established Docket ID No. EPA–HQ–OAR–2024–0333 for this action. All documents on the docket are listed at *https:// www.regulations.gov.* Although listed in the docket index, some information may not be publicly available, *e.g.,* Confidential Business Information (CBI) or other information for which disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Docket materials are available electronically to the public through *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** For information about this final rule, contact Erin Lowder, U.S. EPA, Office of Air Quality Planning and Standards, Air Quality Policy Division, C535–A Research Triangle Park, NC 27709; telephone number: (919) 541–5421; email address: *lowder.erin@epa.gov;* or Robert Lingard, U.S. EPA, Office of Air Quality Planning and Standards, Air Quality Policy Division, C539–01 Research Triangle Park, NC 27709; by telephone number: (919) 541–5272; email address: *lingard.robert@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," or "our" means the EPA.

### Table of Contents

I. General Information
  A. Does this action apply to me?
  B. Where can I get a copy of this document and other related information?
II. Overview and Basis of Final Rule
  A. Background and Summary of Final Rule
  B. Statutory Authority for Final Rule
III. Final Actions
  A. Default Deadlines for Reclassified Nonattainment Areas Under the Ozone NAAQS
  1. Summary of Proposal
  2. Final Rule
  3. Comments and Responses
  a. Default Deadlines Generally
  b. SIP Submittal Deadline for All Elements, Except for the CAA Section 185 Fee Program Element
  c. SIP Submittal Deadline for the CAA section 185 Fee Program Element
  d. Deadline for RACT Implementation
  e. Deadline for I/M Implementation
  B. Status of Certain Requirements of Former Classification
  1. Summary of Proposal
  2. Final Rule
  3. Comments and Responses
  C. Serious Area SIP Revisions for the 2015 Ozone NAAQS
  1. Summary of Proposal
  2. Final Rule
  3. Comments and Responses
  a. Due Date for Serious Area SIP Revisions and RACT Implementation
  b. Deadline for Serious Area I/M Implementation
IV. Environmental Justice Considerations
V. Judicial Review
VI. Severability
VII. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review
  B. Paperwork Reduction Act (PRA)
  C. Regulatory Flexibility Act (RFA)
  D. Unfunded Mandates Reform Act (UMRA)
  E. Executive Order 13132: Federalism
  F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
  H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use
  I. National Technology Transfer Advancement Act (NTTAA)

J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All

K. Congressional Review Act (CRA)

## I. General Information

### A. Does this action apply to me?

Entities potentially affected directly by this final rule include state, local, and tribal governments and air pollution control agencies (''air agencies'') responsible for attainment and maintenance of the NAAQS. Entities potentially affected indirectly by this final rule as regulated sources include owners and operators of sources of emissions of volatile organic compounds (VOCs) and nitrogen oxides ($NO_X$) that contribute to ground-level ozone formation.

### B. Where can I get a copy of this document and other related information?

In addition to being available in the docket, an electronic copy of this **Federal Register** document will be posted at *https://www.epa.gov/ground-level-ozone-pollution/ozone-implementation-regulatory-actions.*

## II. Overview and Basis of Final Rule

### A. Background and Summary of Final Rule

The EPA is finalizing in this action default SIP submittal and implementation deadlines for areas reclassified as Moderate, Serious, and Severe by operation of law pursuant to Clean Air Act (CAA or Act) section 181(b)(2) and voluntary reclassification requests pursuant to CAA section 181(b)(3). These default deadlines are applicable for all current and future ozone NAAQS.

States responsible for areas initially designated as nonattainment under an ozone NAAQS are required to prepare and submit SIP revisions by deadlines relative to the effective date of the rule establishing area designations and classifications, and the submission deadlines vary depending on the SIP element required (*e.g.,* the statute provides 3 or 4 years from initial nonattainment designation to submit SIPs for some requirements and 2 years for others). Areas initially designated as nonattainment are also required to implement reasonably available control technology (RACT) as expeditiously as practicable, but no later than January 1 of the 5th year after the effective date of designations.

The EPA recognizes that upon reclassification to a higher classification, especially when under CAA section 181(b)(2), a state can be faced with limited time to submit and implement required SIP revisions prior to the next attainment date. In addition, in some cases, the SIP submission and implementation deadlines associated with areas previously classified at a particular level may have already passed at the time of reclassification, making it impossible to apply those original SIP submission and implementation deadlines to areas that are reclassified to that classification level upon failure to attain by a lower classification attainment date or by voluntary request. In light of these considerations, the EPA has historically adjusted deadlines pursuant to the general rulemaking authority granted under CAA section 301(a) to prescribe regulations as are necessary to carry out the functions of the Act, and the specific authority granted by CAA section 182(i).[1] The EPA has promulgated these adjustments of SIP submission and implementation deadlines that apply to reclassified areas with the intent to assure consistency amongst submissions, encourage meaningful reductions towards expeditious attainment of the NAAQS—mindful of newly applicable attainment dates—and promote planning flexibility where possible.

On October 4, 2024, through a notice of proposed rulemaking (NPRM), the EPA solicited public comment on proposed regulatory text codifying default SIP requirements, including submittal and implementation deadlines, that would apply to any nonattainment areas reclassified as Moderate, Serious, and Severe under the current and any future ozone NAAQS. Refer to the proposal for a description of the requirements that were proposed to apply to areas reclassified as Moderate, Serious or Severe.[2] The public comment period for the NPRM ran from October 4, 2024, to November 4, 2024. The EPA received a total of 16 comment submissions on the NPRM. The preamble to this final rule discusses significant comments received on the NPRM and how those comments were considered by the EPA.[3] The comments and the EPA's responses are organized in this final rule under subject titles, and in the same order as they appear in the NPRM. The Response to Comments document associated with this final rule contains our responses to comments that are general in nature or outside the scope of the final rule. The public comments received on the NPRM are posted in the docket at *https://www.regulations.gov* (Docket ID No. EPA–OAR–HQ–2024–0333).

We are finalizing default SIP requirements, including submittal and implementation deadlines, for all ozone nonattainment areas reclassified as Moderate, Serious, and Severe under the current and any future ozone NAAQS. This final rule articulates the implementation requirements and timeframes that will apply for all such areas once reclassified, either as a result of failing to attain the standard by the applicable classification attainment date pursuant to CAA section 181(b)(2) or the EPA granting a voluntary reclassification request pursuant to CAA section 181(b)(3). For any nonattainment areas reclassified as Moderate, Serious, and Severe under the ozone NAAQS, we are finalizing regulatory text codifying default SIP submission and implementation deadlines that will apply upon the effective date of reclassification. The EPA is also finalizing regulatory revisions codifying its existing interpretation that following reclassification, a state is no longer required to submit SIP revisions addressing certain, but not all, requirements related to the prior classification level for an ozone nonattainment area.

### B. Statutory Authority for Final Rule

The statutory authority for the actions being finalized in this document is provided by the CAA, as amended (42 U.S.C. 7401 *et seq.*). Relevant portions of the CAA include, but are not necessarily limited to, CAA sections 172, 181, 182, and 301(a).

CAA section 107(d) provides that when the EPA establishes or revises a NAAQS, the agency must designate areas of the country as nonattainment, attainment, or unclassifiable based on whether an area is not meeting (or is contributing to air quality in a nearby area that is not meeting) the NAAQS,

---

[1] CAA section 182(i) specifically provides authority to the EPA to adjust applicable deadlines, other than attainment dates, for areas that are reclassified as a result of failure to attain under CAA section 182(b)(2), to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions. The provision does not specifically reference areas that are voluntarily reclassified under CAA section 181(b)(3); the EPA is therefore adjusting deadlines for such areas under its general rulemaking authority in CAA section 301(a), consistent with CAA section 182(i).

[2] 89 FR 80833 (October 4, 2024).

[3] Each commenter discussed in this preamble is identified by the docket identification number associated with the comment submission. The Response to Comments (RTC) document in this docket for this final rule contains a table identifying each commenter and their associated docket identification number.

meeting the NAAQS, or cannot be classified as meeting or not meeting the NAAQS, respectively. Part D of title I of the CAA establishes the plan requirements that apply to all areas designated nonattainment. The purpose of these plan requirements is ensuring that these areas achieve attainment of the applicable NAAQS by the applicable area attainment date. Subpart 1 of part D sets out the plan requirements for nonattainment areas in general, and subpart 2 of part D of title I of the CAA governs the classification, state planning, and emissions control requirements for any areas designated as nonattainment for a revised primary ozone NAAQS. In particular, CAA section 181(a)(1) requires each area designated as nonattainment for a revised ozone NAAQS to be classified at the same time as the area is designated based on the extent of the ozone problem in the area (as determined based on the area's design value (DV)). Classifications for ozone nonattainment areas range from Marginal to Extreme. CAA section 172 (in subpart 1) covers nonattainment area plan provisions in general, and CAA section 182 (in subpart 2) provides the specific attainment planning and additional requirements that apply to each ozone nonattainment area based on its classification. Subparts 1 and 2 also establish the timeframes by which air agencies must submit and implement SIP revisions to satisfy the applicable attainment planning elements, and require that such plans "shall provide for attainment of the NAAQS," [4] and that the "primary standard attainment date for ozone shall be as expeditiously as practicable" but not later than a maximum attainment date measured from the effective date of the area's designation.[5] The EPA has also promulgated regulations interpreting these requirements for the 2008 ozone NAAQS and the 2015 ozone NAAQS at 40 CFR part 51, subparts X and CC, respectively.

CAA section 182(i) governs the Act's requirements for areas reclassified by operation of law. Specifically, CAA section 182(i) states that areas that are reclassified due to failure to timely attain by the attainment date "shall meet such requirements of subsections (b) through (d) of this section as may be applicable to the area as reclassified, according to the schedules prescribed in connection with such requirements, except that the Administrator may adjust any applicable deadlines (other than attainment dates) to the extent

such adjustment is necessary or appropriate to assure consistency among the submissions." Subsections (b) through (d) of CAA section 182 cover the required SIP revisions for Moderate (182(b)), Serious (182(c)), and Severe (182(d)), and those requirements are generally cumulative. *See, e.g.,* CAA section 182(b) (requiring Moderate areas to make submissions relating to Marginal areas in addition to the revisions for the Moderate classification). The SIP revisions, control measures, and timing of such submissions and controls are intended to, among other things, ensure that areas will attain the NAAQS as expeditiously as practicable, but no later than the applicable attainment date. As discussed in more detail later in this document, most SIP requirements are not dependent on the attainment date itself, but certain SIP requirements are inherently tied to the applicable attainment date and therefore are no longer required for the lower classification after the area is reclassified.

As noted, CAA section 182(i) also provides the Administrator with authority to adjust applicable deadlines (other than attainment dates) for areas that are reclassified as a result of failure to attain the NAAQS under CAA section 182(b)(2), "to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions." In finalizing the adjustment of applicable deadlines for reclassified areas, the EPA considered the timeframes provided under the statute for the submission and implementation of requirements for initial area designations and classifications. Unsurprisingly, many of the nonattainment plan requirements in subparts 1 and 2 establish timing of the submission and implementation of controls such that those plans and controls will influence attainment of the NAAQS within the area by the attainment date.[6] The EPA's submission and implementation schedules for

reclassified areas in this final rule are consistent with the overall schedule of the submission of substantive requirements that are associated with a classification, but adjusts those schedules to fit the abbreviated timeframe available to reclassified areas, in nearly all cases before the next applicable attainment date. In particular, the EPA's deadlines for implementation of controls and SIP submissions are informed by the need to ensure that the reductions resulting from the Act's requirements are consistently due in time to influence an area's attainment by the attainment date, to the extent the applicable controls are necessary to achieve attainment by that date.

While some areas are reclassified due to failure to attain by the attainment date, others may be reclassified as a result of a state's request. CAA section 181(b)(3) states that "[t]he Administrator shall grant the request of any State to reclassify a nonattainment area in that State . . . to a higher classification." In some cases, states may seek voluntary reclassification to a higher classification early in the planning cycle, and in those cases, the existing SIP submittal and implementation deadlines for the higher classification would continue to apply. In other instances, states may request a voluntary reclassification under CAA section 181(b)(3) where the SIP submittal and implementation deadlines have already passed or will occur in the near future. CAA section 182(i) specifically provides authority to the EPA to adjust applicable deadlines, other than attainment dates, for areas that are reclassified as a result of a failure to attain under CAA section 181(b)(2), but section 182(i) does not specifically reference areas that are voluntarily reclassified under CAA section 181(b)(3). Per CAA section 301(a)(1), in the context of implementing subpart 2 planning requirements, the EPA has determined that regulations are necessary to prescribe the SIP submittal and implementation deadlines for such voluntarily reclassified areas, where the deadlines associated with the requested higher classification have already passed or will occur in the near future (*i.e.,* less than 18 months from the effective date of the reclassification).

The EPA's default deadlines being finalized in this document were also informed by the amount of time that the CAA prescribes when new implementation plans are required to be submitted under various circumstances. *See, e.g.,* CAA section 110(k)(5) (allowing the EPA to "establish

---

[4] CAA section 172(c)(1).
[5] CAA section 181(a)(1).

[6] *See, e.g.,* CAA section 172(c)(6) ("Such plan provisions shall include enforceable emission limitations . . . as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part."); CAA section 182(b)(1)(A)(i) ("Such plan shall provide for such specific annual reductions in emissions of volatile organic compounds and oxides of nitrogen as necessary to attain the [NAAQS] of for ozone by the attainment date applicable under this chapter."); CAA section 182(b)(2) (requiring control measures on major stationary sources of VOCs or sources of VOCs covered by a CTG to be implemented as expeditiously as practicable but no later than the beginning of the ozone season of the attainment year).

reasonable deadlines (not to exceed 18 months)'' after notification that a SIP is inadequate); CAA section 179(d) (subpart 1 requirement that within 1 year of a finding that a nonattainment area has failed to attain by its attainment date, States must submit a new SIP revision addressing nonattainment plan requirements). As discussed in more detail in response to comments received on the proposed rulemaking, in section III.A.3. of this preamble, these other CAA provisions are not directly applicable to the EPA's adjustment of deadlines for reclassified areas and do not explicitly constrain the Agency's exercise of discretion and judgment under CAA sections 182(i) and 301(a). CAA sections 110(k)(5) and 179(d) are informative, but not prescriptive, to the EPA's final action.

## III. Final Actions

### A. Default Deadlines for Reclassified Nonattainment Areas Under the Ozone NAAQS

1. Summary of Proposal

The EPA proposed to establish a general default SIP submittal deadline for areas reclassified as Moderate, Serious, or Severe as the sooner of 18 months from the effective date of the reclassification notice or January 1 of the new classification attainment year, except for SIP revisions addressing CAA section 185. For the CAA section 185 fee program SIP submittals required for areas that are reclassified as Severe, the EPA proposed a default deadline of the sooner of 36 months after the effective date of reclassification to Severe or January 1 of the Severe area attainment year. The EPA also proposed that the default SIP submission deadlines could be adjusted where such adjustment is appropriate or necessary, through future notice-and-comment rulemaking in specific EPA actions.

The EPA also proposed default deadlines for implementation of emissions control measures for areas reclassified as Moderate, Serious, or Severe. For reasonably available control technology (RACT), the EPA proposed a default control implementation deadline of the sooner of 18 months after the proposed SIP submittal deadline or the beginning of the relevant attainment year ozone season. For vehicle emissions inspection and maintenance (I/M), the EPA proposed an implementation deadline of no later than 4 years after the effective date of reclassification (unless needed for attainment by the attainment date or to demonstrate reasonable further progress (RFP)). Similar to the SIP submittal deadlines, the EPA proposed that these

default control measure implementation deadlines could be adjusted where such adjustment is appropriate or necessary.

2. Final Rule

The EPA is finalizing regulatory text in line with the EPA's position as described in the proposal. The default SIP submittal deadline for all elements, except for the CAA section 185 fee program element, for areas reclassified as Moderate, Serious, or Severe will be the sooner of 18 months from the effective date of the reclassification or January 1 of the new classification attainment year. For the CAA section 185 fee program SIP submittals required for areas that are reclassified as Severe, the default deadline will be the sooner of 36 months after the effective date of reclassification to Severe or January 1 of the Severe area attainment year. The default control implementation deadline for RACT will be as expeditiously as practicable, but no later than the sooner of 18 months after the proposed SIP submittal deadline or the beginning of the relevant attainment year ozone season. For I/M not needed for attainment by the attainment date or to demonstrate RFP, the default implementation deadline will be as expeditiously as practicable, but no later than 4 years after the effective date of reclassification. The EPA retains the authority under the CAA to deviate from these default deadlines for all ozone NAAQS, consistent with the CAA through future notice-and-comment rulemaking.

3. Comments and Responses

a. Default Deadlines Generally

*Comment:* Three commenters (0030, 0031, 0036) express general support for the proposed default SIP submittal and implementation deadlines, noting that the rulemaking is an effective way to streamline deadlines for ozone nonattainment areas and ensure successful SIP submission and control implementation. One commenter (0036) specifically notes that the EPA should finalize the default deadlines as proposed for the following reasons: (1) these deadlines are legally supported and offer air agencies advanced notice as to when SIPs must be submitted and implemented; (2) it is critical that programs needed to address attainment are implemented no later than the start of the attainment year ozone season; (3) these proposed deadlines offer air agencies some implementation flexibility while acknowledging the constraints of statutorily fixed attainment dates; (4) this proposal would still allow the EPA to set

different submittal and implementation deadlines on a case-by-case basis in the future, as necessary. The commenter believes that, at a minimum, the EPA should finalize these deadlines as they apply to any 2015 ozone NAAQS areas reclassified to Serious. It is critical for nonattainment areas needing to meet the 2015 ozone NAAQS Serious area attainment date of August 3, 2027, to understand the requirements sooner rather than later, given the short time available to plan for and implement those requirements.

*Response:* The EPA agrees with the commenters and is finalizing the deadlines as proposed with minor clarifications as discussed elsewhere in this document.

*Comment:* One commenter (0036) requests that, for any deadlines established by the EPA that are tied to the start of an area's ozone season, the EPA should clarify that the applicable ozone season is the ozone season as modified by an EPA-approved ozone season waiver. The EPA has proposed a general deadline for certain nonattainment area planning and control requirements as the sooner of 18 months after the attainment SIP due date or the start of the attainment year ozone season as listed in appendix D to 40 CFR part 58. However, 40 CFR part 58, appendix D, section 4.1(i) allows the EPA regional administrators to grant case-by-case deviations from the otherwise applicable ozone monitoring seasons listed in appendix D. Due to approved ozone season deviations, it is possible, therefore, for the effective ozone season in a state to differ from the dates listed in the appendix. To account for these situations, the EPA should clarify that any deadlines associated with the attainment year ozone season is the ozone season as promulgated by appendix D to 40 CFR part 58 or the ozone season as modified by an EPA-approved ozone season waiver.

*Response:* While the EPA acknowledges that ozone monitoring seasons may be modified with approved waiver requests under 40 CFR part 58, appendix D, section 4.1(i), we note that these waivers are specific to individual monitoring sites and do not otherwise modify the statewide ozone monitoring seasons listed in table D–3 to appendix D of part 58. While it is possible that the ozone monitoring season could be modified for an individual ozone nonattainment area, this would require an approved waiver for all monitoring sites within the area. We are not aware of any nonattainment areas meeting this condition under the 2008 or 2015 ozone NAAQS, and consider it unlikely to occur in the future. Thus, the EPA is

finalizing default control implementation deadlines that align with the attainment year ozone season as promulgated by appendix D to 40 CFR part 58, as proposed.

*Comment:* One commenter (0030) recommends that the EPA should not allow flexibility in the proposed default deadlines. The commenter notes that allowing deadline extensions reintroduces inconsistencies and undermines the predictability of default deadlines, which is contradictory to the goal of the proposed rule. Furthermore, allowing flexible deadlines can lead to delays in implementing control measures and allowing one state to extend deadlines can set a precedent for others. On the other hand, default deadlines create a sense of urgency and accountability, forcing states to prioritize the NAAQS.

Other commenters (0039, 0042) recommend that the EPA should maximize states' flexibility when implementing ozone NAAQS in reclassified areas. One commenter (0039) notes that retaining the option of adjusting timing of SIP submittals and implementation of controls on a case-by-case basis, while ensuring the timeline is consistent with meeting the NAAQS by the prescribed attainment date, helps to preserve the flexibility contemplated by the CAA and its air quality goals.

Another commenter (0043) requests that the EPA clarify when it is necessary or appropriate to adjust the default deadlines. The commenter notes that the EPA fails to define how it will determine when such an extension is "necessary or appropriate" and requests that the EPA outline the factors a state must show to obtain such an adjustment in deadlines. The commenter feels that while the EPA has the authority under the CAA to adopt modified timeframes, there is far too much ambiguity in the term "as appropriate or necessary" to ensure that this "standard" will be properly and uniformly applied if a state submits a request.

*Response:* We are finalizing as proposed the default deadlines for reclassified areas that acknowledge that such deadlines may be further adjusted via a notice-and-comment rulemaking per CAA section 182(i). However, we agree with those commenters who note that any flexibility to set deadlines under CAA section 182(i) is constrained by the Act's requirement that the EPA ensure areas expeditiously attain the NAAQS no later than the attainment date. As an initial matter, the EPA is finalizing as proposed the overall limitation of when an adjustment of deadlines is triggered. Where otherwise

applicable deadlines that apply to areas initially designated nonattainment have not yet passed or are more than 18 months from the effective date of the reclassification, those deadlines will continue to apply to reclassified areas. Therefore, the default SIP submittal and implementation deadlines finalized in this action, and any adjustment thereof, only apply where those otherwise applicable deadlines have either passed or are less than 18 months in the future from the effective date of the reclassification.

We also note that the deadlines in the EPA's final action inherently already cover much of the available flexibility for reclassified areas. By structuring the default deadlines as "the earlier of" an outside timeframe (*e.g.,* 18 months) or a specific date (*e.g.,* January 1 of the attainment year), the EPA is maximizing available time for SIP development, adoption, and submission, while still ensuring that controls are adopted into the SIP and implemented in time to influence attainment of the NAAQS by the attainment date. We anticipate any remaining flexibility on adjustment of deadlines, which again must be adopted through rulemaking after public notice-and-comment, to be minimal. As noted in the proposal, the EPA has in certain historical instances established a SIP submission deadline for reclassified areas as the beginning of the ozone season attainment year (*e.g.,* in March, April, or May) rather than January 1 of the attainment year. We think such flexibility, for example, is permissible under the Act's requirements. But as we stated in the proposal, there are outer boundaries to establishing reasonable deadlines under CAA section 182(i); namely that we cannot establish SIP submission deadlines for a control subsequent to a date when those controls are required under the CAA to be implemented. 89 FR 80839 (October 4, 2024).

Given the limited nature of the anticipated further adjustment of deadlines, we decline at this time to adopt a strict standard or to enumerate factors that must be considered. Rather, we will issue any such adjustments to the finalized default deadlines in accordance with the statutory text of CAA section 182(i), which allows the Administrator to "adjust any applicable deadlines (other than attainment dates) to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions." Those adjustments will be subject to notice-and-comment rulemaking, providing the public the opportunity to provide input on the

EPA's application of the statute in those specific circumstances.

*Comment:* Several commenters provided input regarding the proposal's establishment of 18 months from the effective date of reclassification as the outer bound of the proposed general default deadline for SIP submissions for reclassified areas. Three commenters (0032, 0040, 0042) assert that the EPA's rationale for relying on CAA section 110(k)(5) to establish the proposed default deadlines is flawed, and that 18 months does not provide sufficient time to develop revisions to a SIP for an area that has been reclassified. Two of these commenters (0032, 0042) note that the EPA uses the CAA section 110(k)(5) 18-month timeframe for states to submit SIP revisions as indication that Congress judged this timeframe to be sufficient for states to identify and develop control measures, draft revisions to address attainment plans and other requirements, and complete the required public notice process, adopt such revisions, and submit them to the EPA. These two commenters claim that this is not an acceptable comparison to starting a SIP from the beginning because CAA section 110(k)(5) only applies when an existing SIP requires a revision. These commenters further provide that, in relying on CAA section 110(k)(5) in the proposal, the EPA underestimates the efforts developing a new SIP takes. In addition, one of the commenters (0042) states that CAA section 110(a)(1) provides states with up to 3 years to submit SIP revisions after a NAAQS promulgation or revision and notes that the statute allows the EPA to prescribe a shorter timeframe for such submissions, but the EPA must consider all relevant factors and provide a rational justification for such shorter timeframe. The commenter believes that the EPA's argument that 18 months is the outer bound of reasonableness fails to consider the technical complexity and unique challenges in achieving attainment of the ozone NAAQS facing states, which the commenter claims is particularly true in the case of areas reclassified as Severe. Another commenter (0040) provides that the EPA has not cited to any authority where the EPA is required to abide by the deadlines found in CAA sections 110(k)(5) and 179(d) when setting deadlines for areas that have requested voluntary reclassification. The commenter notes that, in a prior action (*see,* 89 FR 51829, June 20, 2024), the EPA explicitly noted that CAA sections 110(k)(5) and 179(d) do not directly apply to areas that are voluntarily reclassified, rather they are just

informative of what a potentially appropriate deadline may be.

Another commenter (0045) claims that the CAA explicitly provides an 18-month period to states to submit their SIPs to the EPA and to implement those SIPs. This commenter asserts that Congress has provided an overt prescription of 18 months as an adequate standard for SIP development, submittal, and implementation, and that the EPA has distorted Congress' intention in the proposal by interpreting "this clause" as a mere recommendation. Other commenters (0037, 0043) assert that a default SIP submission deadline of less than 18 months is contrary to the Act, which they allege establishes that 18 months is the sufficient timeframe. These commenters assert that any amount of time less than 18 months is not reasonable, cannot be justified, and imposes unfair and arbitrary burdens on the state that are contrary to the Act.

Conversely, one commenter (0044) claims that it is unlawful and unnecessary for the EPA to provide states up to 18 months to make a SIP submittal following reclassification, and the EPA's reliance on CAA section 110(k)(5) is flawed. The commenter asserts that CAA section 179(d), which establishes a 12-month deadline for nonattainment SIP submittals for areas that fail to timely attain, is the more relevant CAA deadline. The commenter states that because nothing more specific supports or overrides CAA section 179(d), that "generally applicable nonattainment SIP requirement dictates the outer bound of the EPA's authority to extend SIP submittal deadlines following ozone reclassifications." The commenter points to the EPA's rule regarding reclassifications of areas designated Marginal under the 2015 ozone NAAQS to illustrate that the EPA has previously determined that 12 months provides adequate time for nonattainment SIP submittals.

*Response:* As noted in the proposal, neither CAA section 179(d) nor section 110(k)(5) are directly applicable to reclassified ozone areas, and the EPA therefore disagrees with all commenters that have suggested that either of these two provisions dictate how the EPA should adjust deadlines for reclassified areas under CAA section 182(i).

CAA section 179(d)(1) requires the state containing a nonattainment area to submit within 12 months of the CAA section 179(c) determination that the area failed to attain by its attainment date, a revision to their SIP that meets the requirements of CAA section 110 and CAA section 172 and any additional measures that the Administrator may reasonably prescribe. This final action establishes deadlines for states containing areas for which the EPA has made a determination that an area failed to attain under CAA section 181(b)(2), not CAA section 179(c). We therefore do not agree with commenters who allege that CAA section 179(d) "dictates the outer bound of the EPA's authority" to establish deadlines for the SIP revisions that are required pursuant to ozone determinations and reclassifications made under CAA section 181(b)(2). Rather, the authority to establish subpart 2 deadlines for areas reclassified pursuant to CAA section 181(b)(2) is explicitly granted in CAA section 182(i), which contains no reference to CAA section 179(d) as establishing an outside limit to the EPA's authority.

CAA section 110(k)(5) states that "[w]henever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant [NAAQS], to mitigate adequately the interstate pollutant transport described in section 7506a of . . . or section 7511c of [the CAA], or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies." The CAA section 181(b)(2) determinations that ozone nonattainment areas have failed to attain by their attainment dates are not, unless otherwise specified, the findings of inadequacy that the EPA issues under CAA section 110(k)(5). Therefore the authority to establish deadlines for SIP revisions to address SIP inadequacies identified under CAA section 110(k)(5)—*i.e.,* the authority that provides that the EPA "may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions"—does not apply to the SIP revisions that are required as a result of the EPA's determinations under CAA section 181(b)(2) that ozone nonattainment areas have failed to attain or the EPA's reclassifications of areas voluntarily requested by air agencies under CAA section 181(b)(3). The commenter who asserted that the 18-month timeframe is an "overt prescription" that dictates what the EPA must finalize as a deadline in this rule is therefore plainly incorrect.

Rather, as the EPA stated in the proposal, the Agency's choice to refer to CAA sections 179(d) and 110(k)(5) were for the purpose of informing its exercise of discretion under CAA section 182(i). We do not agree with commenters who assert that Congress' establishment of deadlines in those two provisions

somehow created substantive thresholds for the EPA's adjustment of deadlines under CAA section 182(i) such that the EPA must "justify" divergence from either. We continue to think it is a permissible exercise of the EPA's discretion under CAA section 182(i) to adjust deadlines to establish a default deadline of no more than 18 months, where the available time before the next attainment deadline permits. Commenters who assert that 18-months should be the minimum timeframe for reclassified areas to revise SIPs because revising a SIP per CAA section 110(k)(5) is not the same as "starting a SIP from the beginning," ignore the fact that any reclassified areas subject to the deadlines in this rule will have already been designated nonattainment for at least 3 years, and for classifications beyond Marginal, many more than three. Because the subpart 2 requirements are cumulative and build on each classification, reclassified areas revising their SIPs to address the requirements of their new classification will also not be starting from scratch. States containing these areas will not only have been subject to the general infrastructure SIP requirements that all states are required to submit after promulgation of a NAAQS, but they will also have been subject to any lower subpart 2 classification requirements that have applied since areas were designated nonattainment. Moreover, the assertion that Congress would have intended states to be entitled to a minimum of 18 months to revise SIPs is contrary to the similar provisions the EPA alluded to in CAA sections 110(k)(5) and CAA section 179(d).[7] CAA section 110(k)(5) on its face defines a reasonable deadline as "not to exceed 18 months." And CAA section 179(d), which as some commenters point out is the Act's default deadline for non-ozone areas that have failed to timely attain establishes an outer boundary of 12 months to revise a SIP. So, we do not agree that there is statutory support for commenters' contention that a deadline of anything less than 18 months is unreasonable, unworkable, or contrary to the Act, when the Act plainly identifies less than 18 months as the routine expectation for a SIP revision in similar situations.

---

[7] *See* also schedules for plan submissions for areas designated nonattainment for particulate matter in CAA section 189(a)(2)(B) (providing a maximum of 18 months to submit a nonattainment plan after initial designation to nonattainment) and section 189(b)(2) (providing a maximum of 18 months to submit a revised nonattainment plan for particulate matter areas reclassified as a result of failure to attain by the attainment date).

With respect to commenters who suggest the EPA should look to CAA section 110(a)(1)'s provision of up to 3 years to submit SIP revisions after a NAAQS promulgation or revision as guidance for its establishment of subpart 2 deadlines for reclassified areas, the EPA does not agree that this timeframe is appropriate. As an initial matter, CAA section 110(a)(1)'s provision of 3 years after the promulgation of a NAAQS is a generally applicable requirement that was not directed at nonattainment areas.[8] That deadline of 3 years, which in any case the Administrator is permitted to shorten,[9] is untethered from the more-specific statutory purpose of achieving attainment by an attainment deadline, and therefore does not have direct relevance to the issue facing reclassified areas, which are not only nonattainment areas, but specifically nonattainment areas that have either already failed to attain by an attainment date or whose states have recognized are unlikely to do so and have therefore requested to be reclassified.

The EPA also explained at proposal why the attainment deadlines and stringency of requirements under subpart 2 cannot accommodate a long deadline such as the 3 years requested by the commenter. See 89 FR 80838–39 (October 4, 2024). CAA section 181(a)(1) establishes the timeframes for maximum attainment deadlines under the Act, and those timeframes are based on the number of years from area designations. Marginal areas have no more than 3 years to attain, Moderate areas 6 years, Serious areas 9 years, Severe areas 15 years, and Extreme areas 20 years. For many of the reclassified areas to which this rule would apply, the time between the attainment deadlines is only 3 years to begin with. For example, a Marginal area that failed to attain by its maximum attainment deadline of August 3, 2021, and is reclassified to Moderate has only until August 3, 2024, to attain. And, as

discussed in the proposal and elsewhere in this final action, per the CAA's explicit language in 181(b)(2), the determination of whether that Moderate area attains by August 3, 2024, will be based on the area's design value as of that date, *i.e.,* monitoring data from 2021, 2022, and 2023. Even if the EPA issued the finding that the area failed to attain immediately after the August 3, 2021, attainment date, providing the area 3 years to submit a new SIP for the reclassified Moderate requirements, or until August 3, 2024, would necessarily mean that any new emissions controls required by that SIP would have no impact on the area's likelihood of attaining by the next attainment date. We therefore think that for SIP deadlines associated with these reclassifications—Marginal to Moderate, and Moderate to Serious—the commenter's suggestion that the EPA look to section 110(a)'s provision of 3 years is plainly unworkable. Even for areas reclassified as Severe, which will likely have a longer interval between reclassification to Severe and the Severe area attainment date, the EPA explained at proposal why for these areas that have failed to timely attain multiple times, the 18-month deadline for SIP submissions would benefit such areas, including that control measures contributing to attainment could be implemented for multiple ozone seasons prior to the maximum attainment date. See 89 FR 80841(October 4, 2024). The commenter has not explained why the EPA's reasoning for maintaining a consistent deadline under CAA section 182(i) for these areas is unreasonable.

We are finalizing a default SIP submission deadline with an outer bound of 18 months from the effective date of reclassification. We are finalizing this more extended timeframe for submitting new area requirements triggered by reclassification (as opposed to 12 months, which was also contemplated in the proposal), because we acknowledge, as raised by many commenters, the general complexity in developing and implementing effective emission reductions for ozone nonattainment areas, and the opportunity a longer timeframe provides for more attainment demonstration plans that are likely to meet applicable CAA requirements.

## b. SIP Submittal Deadline for All Elements, Except for the CAA Section 185 Fee Program Element

*Comment:* One commenter (0042) recommends that the EPA should not finalize its proposal for areas that request voluntary reclassification with existing submittal deadlines that are 18

months or more from the effective date of reclassification. The commenter notes that the EPA presumes that existing deadlines associated with a higher classification that have not passed will always be practicable for states to meet without adjustment, but provides no rationale in support of such assumption. The commenter believes that the EPA should neither prejudge, nor foreclose, longer submission deadlines.

*Response:* The EPA's authority to establish deadlines for areas that have voluntarily requested reclassification under CAA section 181(b)(3) is governed by CAA section 301(a). *See* 89 FR 80837 (October 4, 2024) n.12. That provision states, ''The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter.'' CAA section 301(a). In proposing to establish default deadlines for areas requesting a reclassification, the EPA elected to apply such deadlines only where an existing deadline has passed *or* there is less than 18 months until the deadline. The commenter is therefore incorrect that the EPA presumed that any deadline associated with a higher classification that had not passed would be practicable for a state to meet; on the contrary, the EPA proposed that if the existing deadline was less than 18 months away, that there was a presumption that it would be necessary to adjust the deadline. The EPA also explained its rationale in support of retaining existing deadlines that were 18 months or more from the reclassification. 89 FR 80837(October 4, 2024). Where that period of time remained prior to an existing deadline, we stated that we did not find it ''necessary'' under CAA section 301(a) to prescribe a different deadline than what the statute had provided for initially designated and classified areas. To make that adjustment, we believed we needed to provide a reason for doing so—that it would assure expeditious attainment of the NAAQS or ensure that the required submissions would be implemented consistently with the Act's structure—and we did not find a reason to do so where a state still had 18 months before an existing deadline. We also pointed out that the CAA's establishment of 18 months as an outer boundary for a ''reasonable deadline'' for a SIP revision to address an inadequacy (per CAA section 110(k)(5)) indicates that Congress judged that this timeframe would be sufficient for states to identify and develop control measures, to draft revisions to address attainment plans and other requirements, complete the required

---

[8] *Cf.* Stephen D. Page, Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2), September 13, 2013, at 52, available at *https:// www.epa.gov/sites/default/files/2015-12/ documents/guidance_on_infrastructure_sip_ elements_multipollutant_final_sept_2013.pdf* (explaining that the submission deadline for infrastructure SIPs under CAA section 110(a) do not apply to nonattainment areas, because SIP submissions for designated nonattainment areas ''are subject to a different submission schedule than those for section 110 infrastructure elements'').

[9] CAA section 110(a)(1) (''Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years *(or such shorter period as the Administrator may prescribe)* after the promulgation of a national primary ambient air quality standard (or any revision thereof) . . .'') (emphasis added).

public notice process, adopt such revisions, and submit them to the EPA.

*Comment:* One commenter (0042) urges the EPA to set default SIP submittal deadlines no sooner than January 1 of the applicable attainment year for all classifications. The commenter asserts that, in the case of voluntary reclassifications, a SIP submittal deadline of 18 months may be sooner than those given to states that are reclassified as a result of failing to attain, and the EPA provides no rationale to support such earlier deadline. The commenter further provides that states requesting voluntary reclassification do so due to the need for additional time to develop and implement control measures, and reducing the possible additional time available ignores the statutory principle supporting the need for such additional time. In addition, the commenter urges the EPA to update the RACT SIP submittal deadline in the CFR to reflect a general default RACT submittal deadline for reclassified areas of no sooner than January 1 of the applicable attainment year, for all Moderate and higher classifications.

Similarly, another commenter (0039) recommends that the proposed default submission deadline not apply to areas for which a state has voluntarily sought reclassification. The commenter notes that states asking for voluntary reclassification of an area will, in many cases, have more time before the attainment date to plan and implement a SIP than will a state with an area that has been involuntarily reclassified upon failure to attain. The commenter claims that default submission deadlines should not unnecessarily constrain the planning timeline for areas that states have voluntarily reclassified because states that voluntarily reclassify an area often do so to afford them additional time to plan for SIPs and implement the associated control measures to bring the area into attainment.

Conversely, one commenter (0044) agrees with the EPA that under no circumstance should nonattainment SIP submittals be due later than January 1 of the applicable attainment year.

*Response:* We do not agree with the commenters' requests to establish SIP submittal deadlines no sooner than January 1 of the attainment year or not to establish any default deadlines at all for areas that voluntarily request to be reclassified. With respect to the commenter who stated that establishing a deadline of 18 months for a voluntarily reclassified area might render that deadline sooner than the deadline that would apply to an area that failed to attain and was reclassified,

the EPA agrees that this might be the practical outcome. However, we do not agree with commenter's insinuation that there would be anything unreasonable or inappropriate about this result. A state that early on recognizes that its area is unlikely to timely attain and seeks additional time for planning and development of control measures can time its request for voluntary reclassification in order to ensure that existing deadlines that are further out than 18 months apply *or* that the state can at least have the full default 18 months to develop its SIP. In most mandatory reclassifications due to failure to timely attain, those states and areas will not have the benefit of 18 months of SIP development time, because of how compressed the CAA's attainment deadlines are for the lower classifications. So while a voluntary reclassification area might have a "sooner" deadline than an area that is mandatorily reclassified, the area that requests reclassification early enough to obtain the 18 month default deadline (or early enough to have more than 18 months until an existing SIP deadline) will ultimately have *more time, i.e.,* more months, to develop its SIP than the area that is mandatorily classified and subject to the January 1 of the attainment year default deadline. The area that early requests voluntary reclassification will also have the benefit of having control measures in its SIP revisions in place for longer before the next attainment date, increasing the likelihood that it will expeditiously attain the NAAQS by that next date. Finally, commenter asserts that there is a "statutory principle supporting the need for such additional time" for states requesting voluntary reclassification, but the commenter does not identify any statutory provision to support its statement. The CAA does not provide any explicit authority for the EPA to establish new SIP submittal deadlines for areas that request to be voluntarily reclassified. The EPA has exercised its discretion under CAA section 301(a), in the context of implementing subpart 2 requirements, to establish such deadlines where it has determined that doing so is necessary, but we do not agree that there is any statutory support for commenter's request to provide states requesting voluntary reclassification the absolute latest possible deadline to submit a new SIP, with the minimum timeframe for emission reductions that would influence timely attainment.

The EPA acknowledges, and to some extent agrees, with the comments that states might request voluntary

reclassifications due to the need for additional time to develop and implement control measures than would be afforded to them if they were to wait to be mandatorily reclassified under CAA section 181(b)(2) for failing to attain by the applicable attainment date. However, as noted in the proposal, for any states that seek a voluntary reclassification to a higher classification early in the planning cycle, the existing SIP submittal and implementation deadlines for the higher classification would apply, which could result in SIP submittal deadlines longer than 18 months. On the other hand, any states that seek a voluntary reclassification to a higher classification after the original deadlines have passed or are in the near future (*i.e.,* less than 18 months from the effective date of reclassification), they will be subject to a SIP submittal deadline of 18 months from the effective date of reclassification or January 1 of the applicable attainment year, whichever is sooner. In either case, the codification of these default deadlines will provide states with advance notice and certainty of the applicable SIP submittal and implementation deadlines for any reclassified ozone areas such that they can begin developing, adopting, submitting, and implementing their SIPs as soon as possible. We therefore do not agree with the commenter who suggested that areas requesting reclassification should not be subject to the default deadlines; establishing a fixed framework for when and how deadlines will apply to such areas will allow states with implementation obligations for these areas to plan with more certainty than under the existing regime, where states requesting reclassification have had to wait for the EPA's notice-and-comment rulemakings to establish final SIP submission deadlines for reclassified areas.

As to the comment about establishing a RACT SIP submittal deadline of no sooner than January 1 of the applicable attainment year for all Moderate and higher classifications, the commenter did not provide a rationale in support of this recommendation. Therefore, the EPA declines at this time to establish such a deadline for RACT SIP revisions.

*Comment:* One commenter (0044) asserts that the EPA's proposal to establish default SIP submittal deadlines based on the effective date of reclassification is legally and practically flawed for two reasons: (1) it is arbitrary and irrational for the EPA to key dates for nonattainment SIP deadlines to the effective date of reclassification rather than the attainment date; and (2) even if the SIP submittal deadline could

lawfully be tethered to the timing of final action on the reclassification, the EPA has not provided a justification for tethering the SIP submittal deadline to the effective date (rather than date of publication). The commenter recommends that the EPA key SIP submittal deadlines to attainment dates rather than the date by which the EPA acts on states' failure to timely attain because states know whether they have failed to attain and failed to qualify for an extension of the attainment date well before the area's attainment date, let alone the date by which the EPA finalizes a reclassification or makes it effective. This is because attainment is based on ozone season monitor data from the 3 years preceding the attainment year. Because states are on notice from before their attainment date that they are going to fail to attain and be reclassified, it is appropriate for the EPA to base SIP submittal deadlines on the expectations that states will begin working on these submittals prior to the EPA's finalization of reclassifications. This commenter points out that the EPA has historically failed to timely issue determinations that areas failed to attain (with the accompanying reclassifications), and suggests that adding 18 months to those late determinations would have resulted in SIP submittal deadlines many months after all relevant ozone seasons for the next applicable attainment date had already passed.

Another commenter (0045) expresses that the proposal does not enforce a uniform deadline for all nonattainment areas and asserts that the deadline for SIP submittal is relative to the effective date of the rule establishing area designations. The proposed relativity of the SIP submittal deadline is unclear, and the proposal does not include a fixed period for nonattainment areas to develop and submit SIPs. Congress' 18-month period has been nullified in this proposed rulemaking, as states will not be entitled to that time, yet there is no range of time provided in the proposal that reveals how long it should take for states to develop and submit SIPs.

*Response:* Commenters have presented other potential ways of structuring the adjustments in deadlines for reclassified areas, but we do not agree that the EPA's proposal to require new SIP submittals 18 months from the effective date of reclassification but in any case no later than January 1 of the attainment year is either barred by the CAA or arbitrary or irrational. CAA section 182(i) contains no indication that the grant of authority to the EPA to adjust deadlines in that provision is cabined by a requirement to "key" those

deadlines to attainment dates, nor that the adjusted deadline must be 18 months, as one commenter suggests.

With respect to the commenter's argument that it is irrational for the EPA to base SIP submittal dates on the effective date of reclassification rather than attainment dates, it is not clear what alternative framework the commenter is advocating for. The commenter does not explain whether they believe that the Act requires the EPA's adjusted deadlines under CAA section 182(i) to be a certain number of months from the preceding attainment date or a certain number of months prior to the new attainment date. The suggestion of "keying" SIP submittal deadlines to attainment dates, with no explanation of how to do so, is odd given the commenter's invocation of CAA section 179(d) as a model, since CAA section 179(d) "keys" new SIP submittals to the EPA's determinations that areas failed to timely attain, rather than past or future attainment dates. Nor does the commenter's reference to the EPA's historically tardy determinations under CAA section 181(b)(2) explain how any alternative framework would result in more expeditious attainment of the NAAQS. The EPA acknowledges that its historical determinations under CAA section 181(b)(2) have not met the statutory deadline. The EPA proposed and is finalizing these default SIP deadlines that would apply to prospective determinations and reclassifications, in part to streamline the issuance of those mandatory attainment determinations by removing the need to conduct a new rulemaking to adjust applicable deadlines each time areas are reclassified as a result of those determinations. To the extent the commenter is advocating for a system of deadlines that encourage states to begin working early on attainment planning for the next attainment date, we believe the default deadlines in this final action accomplish that policy goal as effectively as the commenter's suggestion. The default schedule for reclassified areas creates certainty for states regarding when SIP submittals for higher classifications will be due, such that they can begin to plan for the next attainment date.

We also do not agree with the commenter's hypothetical application of the proposed default deadlines to the EPA's past tardy determinations. The commenter suggests that under the EPA's proposed default deadlines, the SIP submittal deadline would have been several ozone seasons *after* the relevant attainment date. But the EPA's proposal, and final action, explicitly accounts for the compressed timeframe that can

occur by establishing SIP submittal deadlines that are the *earlier* of 18 months from the reclassification action or January 1 of the attainment year. In the example posited by commenter, therefore, the EPA's proposed default deadline framework would result in a SIP submittal deadline of January 1 of the attainment year, *not* 18 months from the reclassification action. In fact, as explained in the proposal, the EPA was cognizant that the default deadlines in this action are consistent with how it has historically established deadlines for reclassified areas, *i.e.*, by no later than the beginning of the attainment year ozone season to ensure that emission reductions would influence attainment by the attainment date. 89 FR 80839 (October 4, 2024) n.17, 18.

Finally, we do not agree that CAA section 179(d)'s establishment of a deadline triggered off of publication of a determination rather than the effective date of a determination mandates that the EPA's adjusted deadlines under CAA section 182(i) must also be structured in the same way, even if the EPA could structure its adjusted deadlines in that way. Nothing in CAA section 182(i) suggests that Congress intended to require the EPA's adjusted deadlines to be triggered off of the publication of its determination rather than the effective date of its determination. We also note that the practical difference between the commenter's suggestion and the EPA's action is small; the only time a difference would come into play is where there is sufficient time between the EPA's determination and the next attainment date such that the 18-month deadline (rather than January 1 of the attainment year) would apply. In such situations, the difference between commenter's suggested deadlines and the EPA's default deadlines would be 30 days, *i.e.*, 18 months from publication (commenter's suggestion) and 19 months (the EPA's deadlines). As noted in the proposal, the EPA has historically established deadlines for submission and implementation of plan revisions based on the effective date of a reclassification action, and we do not agree that the Agency is prohibited from doing so here. For example, in its implementation rule for the 2015 ozone NAAQS, the EPA finalized a default submission deadline for RACT SIP revisions of "no later than 24 months after the *effective date of reclassification,* or by an alternative deadline established by the Administrator as part of the action reclassifying an area" (emphasis

added).[10] The EPA has also, on numerous occasions, established SIP submittal and implementation deadlines triggered by the effective date of reclassification as part of actions granting voluntary reclassification requests [11] and actions making determinations of attainment by the attainment date.[12]

We also disagree that the other commenter's assertion that the CAA requires the EPA's adjusted deadlines under CAA section 182(i) (or section 301(a) for voluntarily reclassified areas) to be 18 months from the EPA's determination. Nothing in section 182(i) or any other provision of the CAA suggests that such deadlines must be at least 18 months. We also do not agree that the Act requires that there be a uniform or fixed amount of time for states to revise their SIPs after areas are reclassified, and the commenter has provided no statutory support for its contention.

The EPA is therefore finalizing its proposed schedule for states to revise their SIPs to address applicable subpart 2 requirements after ozone nonattainment areas are reclassified, which is the earlier of 18 months from the effective date of reclassification or January 1 of the applicable attainment year.

*Comment:* One commenter (0039) recommends that the proposed default submission deadlines align with the start of the ozone season to provide states with ozone seasons that start later in the year additional planning flexibility. Conversely, one commenter (0032) expresses that the EPA's proposed alternative deadline that aligns with the beginning of an area's attainment year ozone season is inadequate. The commenter notes that, historically, the EPA has provided states 3 years to submit attainment demonstration SIPs and modeling, and 2 years to submit RACT and reasonable available control measure (RACM) SIPs. The commenter requests that the states be afforded this amount of time to submit their SIPs.

[10] 83 FR 62998, 63013 (December 6, 2018).

[11] *See, e.g.,* Clean Air Act Reclassification of the San Antonio, Dallas-Fort Worth, and Houston-Galveston-Brazoria Ozone Nonattainment Areas, TX, Final Rule, 89 FR 51829 (June 20, 2024).

[12] *See, e.g.,* Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Several Areas for the 2008 Ozone National Ambient Air Quality Standards, Finale Rule, 81 FR 26697 (May 4, 2016); Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards, Final Rule, 87 FR 60897 (October 7, 2022).

*Response:* We are finalizing a default SIP submission deadline of 18 months from the effective date of reclassification or January 1 of the applicable attainment year, whichever is earlier. As discussed in the proposal, in some historical instances, the EPA has established the SIP submittal deadline for reclassified areas as the beginning of the attainment year ozone season, rather than January 1 of the attainment year. Given that the beginning of the attainment year ozone season is January 1 for many ozone nonattainment areas, we are setting the maximum default SIP submission deadline as no later than January 1 of the applicable attainment year ozone season to assure consistency among all SIP submissions for ozone nonattainment areas reclassified as Moderate, Serious, and Severe as well as to promote expeditious attainment of the ozone NAAQS.

The EPA declines the request to provide states 3 years to submit attainment demonstration SIPs and modeling, and 2 years to submit RACT/RACM SIPs. While it is true that the CAA provides submission deadlines that range between 2 and 4 years for some requirements, these schedules are based on the effective date of the rule establishing initial area designations. In the case of reclassifications, these initial SIP submittal and implementation timelines have already been established and, in many cases, are in the past or the near future (*i.e.,* less than 18 months away) at the time of reclassification. Because reclassified nonattainment areas typically face limited time to submit and implement required SIP revisions prior to the next attainment date, it is impossible to establish default deadlines after an attainment date that would afford states 2 or 3 years to submit their SIPs, if those SIPs are to have any impact on the area's ability to attain by the next attainment date.

### c. SIP Submittal Deadline for the CAA Section 185 Fee Program Element

*Comment:* One commenter (0037) claims that the CAA does not support requiring CAA section 185 fee program SIP submittals any sooner than 36 months after the effective date of reclassification to Severe. In CAA section 185, the attainment year is expressly identified as the year in which the attainment date falls. When setting a deadline in relation to CAA section 185, it is not necessary or practical that there be a submittal more than a year before the attainment date. It is entirely reasonable that states could submit those programs later consistently with the implementation of any potential CAA section 185 fee program because

the fee payment does not arise until the year after the year in which the attainment date falls.

One commenter (0044) urges the EPA to require states to develop CAA section 185 SIPs on the same timeline as contingency measures for failing to attain. The commenter believes that, just like attainment contingency measures, section 185 penalty fees only kick in after an area fails to timely attain. The EPA properly requires states to submit contingency measure SIPs in well under 3 years and provides no rational explanation for treating the two submissions differently. The commenter notes that a section 185 SIP should be fairly straightforward, requiring no assessment of control methodologies, and states therefore should be able to develop it quickly. The commenter further provides that, given the EPA's and the states' history of missing CAA deadlines, the 36 months or January 1 attainment year deadline would very likely mean that a final section 185 rule would not be in place until after an area failed to attain, which is inconsistent with the CAA.

*Response:* The EPA disagrees with the comment claiming that the CAA does not support a submission deadline any sooner than 36 months after the effective date of reclassification to Severe. We are finalizing the default deadline for CAA section 185 fee program element as proposed. The CAA and the EPA's implementing regulations for the 2008 and 2015 ozone NAAQS permit states with ozone nonattainment areas initially classified as Severe to submit a SIP revision that meets the requirements of CAA section 185 within 10 years of the effective date of an area's nonattainment designation. Given that nonattainment areas initially classified as Severe have 15 years to attain the NAAQS after the effective date of designation, states with nonattainment areas initially classified as Severe must submit their CAA section 185 fee program SIPs at least 5 years before the attainment date. Therefore, the EPA disagrees with the comment that it is inconsistent with the CAA for states to submit these SIPs more than a year before the attainment date, and given the Act's structure for initially designated and classified areas, which requires the section 185 fee SIP to be submitted at least 5 years before the attainment date, the commenters have failed to explain why the EPA's default deadline of 36 months after reclassification (but no later than January 1 of the attainment year), is not practical or necessary. As noted in the proposal, the EPA has established a 36-month SIP submission deadline for CAA

section 185 SIPs in the past. Such an extended deadline is supported by the fact that the CAA specifically sets a later SIP submission deadline for the CAA section 185 fee program than for any other elements.[13] In addition, an extended deadline of 36 months after the effective date of reclassification will still typically be more than 18 months before the attainment date, which will still ensure that CAA section 185 fee programs for reclassified areas will be in place ahead of when they are needed. The EPA agrees that the development of the CAA section 185 program should not pose an undue burden on states. However, as noted in the proposal, we believe that providing states with more time for the CAA section 185 fee program SIP submission could allow more focused attention to be spent on other Severe SIP elements in the first 18 months following reclassification.

The EPA likewise disagrees with the comment suggesting that states must develop CAA section 185 SIPs on the same timeline as contingency measures for failing to attain. The commenter is incorrect in claiming that there is no difference between contingency measures and section 185 fee programs. While section 185 fee programs only kick in after an area fails to timely attain, contingency measures may be triggered as a result of an area's failure to meet RFP or a failure to attain by the attainment date. *See* CAA section 172(c)(9). The later deadline finalized in this action for the CAA section 185 SIP for areas reclassified to Severe mirrors the different, later deadline that CAA section 182(d)(3) provides for the section 185 fee program element for initially designated and classified Severe areas, which it does not do for any other element, including contingency measures.[14] To the degree that states want to take advantage of the administrative efficiency of adopting the CAA section 185 fee program element along with other required Severe area SIP elements, which was a benefit the EPA noted at proposal, they would still have the option to submit their CAA section 185 programs earlier.

In addition, we have previously stated that the EPA retains the ability to set an alternative deadline for CAA section 185 SIP submissions, if appropriate, for nonattainment areas reclassified as Severe and that such an adjustment "could be appropriate in situations where the reclassification action occurs on a date that is unreasonably near to or past the 10-year deadline applicable to areas initially designated Severe or

Extreme.'' [15] The appropriateness of such adjustment applies here. The deadlines that we are finalizing as part of this rule would be applicable to any reclassified Severe areas only if the original 10-year deadline established for nonattainment areas initially classified as Severe has passed or is less than 18 months away from the effective date of reclassification. In either case, a deadline of 36 months after the effective date of reclassification or January 1 of the applicable attainment year is reasonable because either date would provide states with adequate time to develop and submit their SIP revisions, while still ensuring that approved CAA section 185 fee programs for reclassified areas will be in place ahead of when they are needed.

Regarding the comment about the EPA and states' history of missing CAA deadlines, we disagree that a default deadline of the earlier of 36 months or January 1 of the attainment year would mean that a state's CAA section 185 program would not be in place until after an area failed to attain. This is unlikely because the CAA provides up to 6 years between the Serious and Severe attainment dates, in contrast to the 3-year intervals for Marginal, Moderate, and Serious classifications. Even with the additional time allowed to develop section 185 fee programs, there will be sufficient time to get such programs in place before the Severe attainment date. Moreover, as noted in the proposal, the purpose of the default deadlines that would apply to reclassified Moderate, Serious, and Severe nonattainment areas is to provide advance notice and certainty to any states with nonattainment areas that may fail to attain an ozone NAAQS by the applicable attainment date as well as any nonattainment areas for which a state requests a voluntary reclassification to a higher classification. The default SIP submission and implementation deadlines that we are finalizing as part of this rule will help streamline the reclassification process and help the EPA, as well as states, meet CAA deadlines in the future. As acknowledged elsewhere in this document, the EPA has routinely adjusted SIP submission and implementation deadlines as part of actions granting voluntary reclassification requests and actions making determinations of attainment by the attainment date. This rule will remove that step from the reclassification process, thereby simplifying and advancing the

nonattainment planning cycle for states and the EPA. We expect that the default deadlines finalized as part of this rule will promote efficiency, allowing states and the EPA to continue working towards CAA goals in a timely manner.

### d. Deadline for RACT Implementation

*Comment:* Two commenters (0039, 0042) recommend that the proposed default RACT implementation deadlines align with the start of the ozone season. One of these commenters (0039) states that this will provide states with ozone seasons that start later in the year additional implementation flexibility. The other commenter (0042) notes that this will allow affected entities to comply with RACT on a timeline that considers sources' ability to control emissions based on technological and economic feasibility, which are primary factors in determining RACT.

Conversely, one commenter (0032) expresses that the EPA's proposed alternative deadline that aligns with the beginning of an area's attainment year ozone season is inadequate. The commenter notes that the CAA requires states to implement RACT as expeditiously as practicable but no later than January 1 of the 5th year after the effective date of designation. The commenter requests that the states be afforded this amount of time to implement RACT.

*Response:* We are finalizing the default RACT implementation deadlines as proposed. While the EPA agrees with the comments asserting that aligning the RACT implementation deadline with the attainment year ozone season will provide states with additional implementation flexibility, the beginning of the attainment year ozone season will not always be the most expeditious deadline for RACT implementation. In those instances, it may be more expeditious for RACT to be implemented earlier (*i.e.,* EPA's proposed 18 months after the date in which RACT SIPs are due). As with other RACT implementation deadlines that the EPA has established for reclassified areas, an underlying consideration is that, consistent with the CAA, the RACT deadline should, where possible, provide at least one full ozone season in advance of an area's maximum attainment date for implemented controls to achieve emission reductions and positively influence an area's monitored design value.[16] In recognition of this, the EPA is finalizing a default RACT implementation deadline of as expeditiously as practicable but no later

---

[13] *See* CAA section 182(d)(3).
[14] *See* CAA section 182(d)(3).

[15] 83 FR 62998, 63009 (December 6, 2018).

[16] 89 FR 80833, 80839 (October 4, 2024).

than the earlier of 18 months from the SIP submittal deadline or the beginning of the attainment year ozone season.

The EPA disagrees with the comment that the EPA should establish a RACT implementation deadline that requires states to implement RACT as expeditiously as practicable but no later than January 1 of the 5th year after the effective date of designation.[17] In reclassification scenarios, it is often the case that the RACT implementation deadlines established for areas initially classified as Moderate, Serious, and Severe have already passed or will occur shortly after the effective date of reclassification, thereby making it impossible or unreasonable for a state to comply with the implementation schedules that initially classified areas must comply with. As such, the EPA is finalizing a default RACT implementation deadline that accommodates the need for additional time to develop SIPs and implement controls, while also establishing that deadline in time to influence attainment by the attainment date. In general, this deadline would provide states with a 36-month schedule for SIP submission and controls implementation for reclassified areas (*i.e.,* 18 months to develop and submit required SIP revisions and an additional 18 months to implement controls). Should fact-specific-circumstances arise that would necessitate a further adjustment of deadlines for a particular nonattainment area, the EPA is reserving the right to establish different implementation deadlines for reclassified areas in separate notice-and-comment rulemakings.

*Comment:* One commenter (0037) believes that there is no basis in the CAA for the EPA to require implementation of controls any sooner than 18 months after the proposed SIP submittal deadline in any given instance of reclassification. The commenter notes that the EPA provides no statutory basis for triggering obligations in advance of a full calendar ''attainment year'' before the year in which the attainment date falls. The commenter claims that the EPA risks upending a state's due consideration of controls and its overall discretion to implement controls to attain the NAAQS consistent with the state's overall economic and air quality priorities by rushing states to implement controls.

Another commenter (0044) believes that the EPA's proposal impermissibly fails to provide states adequate time to fully implement RACT, thereby undermining long-term attainment and maintenance of the ozone NAAQS. This commenter urges the EPA to clarify that, while interim RACT must be implemented as expeditiously as practicable, and no later than prior to the beginning of the applicable attainment year ozone season, RACT must nevertheless be fully implemented even if this necessitates that some components of RACT are implemented subsequent to that attainment year date. By requiring RACT to be fully implemented by deadlines that are already only slightly more than a year out, the commenter claims that the EPA unlawfully precludes states from implementing the full suite of controls that meet the definition of RACT.

Similarly, another commenter (0032) recommends that the EPA should extend the deadline for newly implemented RACT, just as it does for I/M programs. The commenter asserts that the EPA proposed to allow newly required Basic and Enhanced I/M programs to be fully implemented no later than 4 years after the effective date of reclassification, so long as states do not intend to rely upon emission reductions from their newly required Basic or Enhanced I/M program in attainment or RFP SIPs. The commenter believes that this more flexible timeframe should also extend to RACT because states will not be able to rely on RACT for their reclassified 2015 ozone Serious areas by including reductions from it by January 1, 2026, if they cannot practically implement by that date. The commenter asserts that states will be forced to exclude newly implemented RACT from modeling and RFP demonstrations when performing 2026 attainment year modeling and projections.

*Response:* We are finalizing the default RACT implementation deadline as proposed. As an initial matter, we disagree with the commenter's contention that EPA lacks a statutory basis for establishing a default deadline for RACT implementation in advance of the full calendar ''attainment year'' (*i.e.,* the year before the year in which the attainment date falls). CAA section 182(i) delegates to EPA the authority to ''adjust *any* applicable deadlines (other than attainment dates) to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions'' (emphasis added). Commenter points to no

limitation on the EPA's authority contained in the relevant statutory language to support the commenter's position. We also disagree with the commenter's contention that the RACT implementation deadline fails to provide states adequate time to fully implement RACT and unlawfully precludes states from implementing the full suite of controls that meet the definition of RACT. Nothing in this rule reopens or alters the EPA's longstanding definition of RACT [18] as the lowest emission limit that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility. The EPA always has, and will continue to, evaluate state RACT SIP submittals against this definition, and states remain obligated to implement RACT-level controls in nonattainment areas by any applicable implementation deadline. We acknowledge that timely RACT implementation may be difficult. However, we note that the implementation of controls is intended to help states expeditiously attain the NAAQS no later than the attainment date. If a state adopts new or additional control measures as RACT and relies on the emission reductions caused by those control measures to demonstrate RFP and/or attainment, those states must implement such RACT as expeditiously as practicable, but no later than a date by which the state can achieve emissions reductions that positively influence an area's monitored design value (*e.g.,* the earlier of 18 months from the applicable SIP due date or the beginning of the attainment year ozone season). Further, it is important to establish a generic RACT implementation deadline to provide advance notice and certainty to states so that they can undertake preparation and advanced planning, as appropriate, to timely implement any applicable RACT controls. Given these considerations, in establishing a generic default timeline

---

[17] To the extent that the commenter is suggesting that the EPA establish the default RACT implementation deadline as January 1 of the 5th year after reclassification, we decline to establish the generic default RACT deadline in this manner. For further discussion, *see* the EPA's response to commenter (0044) in this section regarding a default RACT implementation deadline beyond the attainment deadline.

[18] *See* State Implementation Plans; General Preamble for Proposed Rulemaking on Approval of Plan Revisions for Nonattainment Areas— Supplement (on Control Techniques Guidelines), Proposed Rule, 44 FR 53761, 53762 (September 17, 1979) (defining RACT as ''The lowest emission limitation that a particular source is capable of meeting by the applicable of control technology that is reasonably available consider technological and economic feasibility'') (citing memorandum from Roger Strelow to Regional Administrators, Regions I–X, Guidance for Determining Acceptability of SIP Regulations in Non-attainment Areas (December 9, 1976). *See also, Keystone-Conemaugh Projects* v. *EPA* (3rd Cir.) No. 22–3026, May 2, 2024 (noting that ''EPA has repeatedly interpreted [RACT] to mean 'the lowest emission limit that a particular source is capable of meeting by the application of control technology that is reasonably available consider technological and economic feasibility'').

in this rule, the EPA is setting the RACT implementation deadline to provide at least one full ozone season in advance of an area's maximum attainment date for implemented controls to achieve emission reductions and positively influence an area's monitored design value.[19] Delays in implementing RACT controls associated with reclassification would delay related air quality improvements and human health benefits for residents across reclassified areas. However, the regulations being finalized here preserve flexibility for the EPA in future individual actions to take a different approach to the RACT implementation deadline for specific areas following notice-and-comment rulemaking.

With respect to commenter's suggestion that the EPA establish a longer implementation horizon for RACT, including beyond the attainment date, we appreciate these comments and will take them under advisement for potential future notice and comment rulemaking. As noted in the proposal and in other portions of this final action, the EPA has long taken the position that the statutory requirement for states to assess and adopt RACT for sources in ozone nonattainment areas classified Moderate and higher is independent from the attainment demonstration for such areas and is not directly linked to the attainment date.[20] The EPA acknowledges that the Agency could, where appropriate, afford additional flexibility in the timeline for implementing RACT. Accordingly, as with the other default deadlines finalized as part of this rule, the EPA is reserving the right to establish a different RACT implementation deadline for reclassified areas in a separate notice-and-comment rulemaking, consistent with its authority under CAA section 182(i) and the CAA's requirements that areas expeditiously attain the NAAQS.

### e. Deadline for I/M Implementation

*Comment:* One commenter (0030) recommends that the EPA should align the deadlines for I/M programs with the deadlines for control measure implementation, within 18 months of SIP submission or before the beginning of the ozone season. The commenter notes that this will ensure consistent submission deadlines, which support the goal of the proposed ruling. The commenter cited studies asserting that mobile sources are a major cause of health impacts because they are one of the largest contributors to ozone-

forming emissions in the U.S., and therefore the commenter believes that I/M programs must be integrated in a timely manner to reduce negative health impacts. They also state that because the EPA emphasized that some SIPs rely on ozone emission reductions via I/M programs, it would be counterintuitive to allow I/M programs to be implemented up to 4 years after the effective date of reclassification despite other control measures being implemented within 18 months.

*Response:* We agree with the commenter that, for SIPs that rely on emission reductions from I/M programs, it would be counterintuitive to allow any new or revised I/M programs to be fully implemented beyond the beginning of the attaining ozone season. We explained at proposal that an I/M implementation deadline of as expeditiously as practicable, but no later than the beginning of the attainment year ozone season applies to reclassified areas relying on emission reductions from their newly required Basic or Enhanced I/M programs for attainment or RFP purposes:

With respect to the default implementation deadlines for Basic and Enhanced I/M programs required as the result of a mandatory reclassification, states wishing to use emission reductions from their newly required I/M programs for the ozone NAAQS would need to have such programs fully established and start testing as expeditiously as practicable, but no later than the beginning of the applicable attainment year ozone season, consistent with the CAA principle (and logic) that measures that are needed to demonstrate attainment by the attainment date must be in place early enough to impact the air quality design value that will be used to determine whether the area attained by that date.[21]

The EPA's requirement in this action that states relying on I/M emission reductions in their attainment or RFP SIPs is consistent with the 2015 ozone implementation rule which requires all control measures in the attainment plan and demonstration to be implemented no later than the beginning of the attainment year ozone season.[22] However, for states that do not intend to rely upon emission reductions from their newly required Basic or Enhanced I/M programs in attainment or RFP SIPs, we maintain, as proposed, that it is reasonable to allow these newly required Basic or Enhanced I/M programs to be fully implemented no later than 4 years after the effective date of reclassification considering the numerous challenges and milestones necessary in establishing a new or

revised I/M program. While mobile sources can be a significant source of ozone-forming emissions, I/M is not the only CAA program that generates emission reductions from mobile sources.

*Comment:* One commenter (0032) believes that the EPA is promulgating a rule that ensures new I/M programs could not be relied on for SIP planning because there is no practical way to start a new I/M program in the proposed timeframe of the beginning of the applicable attainment year ozone season.

*Response:* We respectfully note that the commenter offered no evidence to support a finding that there is no practical way to start a new I/M program in the proposed timeframe of the beginning of the applicable attainment year ozone season.

In practice, many areas where new Basic I/M or Enhanced I/M SIP revisions are required as the result of a reclassification for a new ozone NAAQS may already be operating I/M programs for a variety of reasons, including to satisfy requirements from designation as nonattainment and classification as Moderate or above under a prior ozone NAAQS. Such areas may use emissions reductions from these programs in attainment SIPs if they have also submitted a new I/M SIP revision for such NAAQS that meets the applicable Basic or Enhanced I/M requirements for the new classification.

For areas that might need to start a new I/M program or revise their existing program as the result of a reclassification, we realize that implementing a new or revised I/M program on an accelerated timeline may be difficult given the unique nature of I/M programs, and many challenges, tasks, and milestones that must be met. However, as discussed in other responses to comments in this document, an I/M implementation deadline, for reclassified areas intending to rely on emission reductions from their newly required Basic or Enhanced I/M program in attainment or RFP SIPs, as expeditiously as practicable but no later than the beginning of the attainment ozone season is consistent with the CAA and is pursuant to the existing implementing regulations for the 2008 and 2015 ozone NAAQS.

*Comment:* One commenter (0044) urges the EPA to require states to implement I/M programs as expeditiously as practicable, and no later than a timeline that can influence attainment year air quality. The commenter asserts that the EPA's proposal to allow I/M program implementation after the attainment

---

[19] 89 FR 80833, 80839 (October 4, 2024).
[20] 89 FR 80833, 80847 (October 4, 2024).
[21] 89 FR 80833, 80840 (October 4, 2024).
[22] 40 CFR 51.1308(d)

deadline is unlawful and arbitrary. First, the commenter asserts that the EPA's proposed timeline is contrary to the express indications of Congressional intent, which stipulates that pollution control requirements for nonattainment areas are to take effect before the attainment deadline. In the case of Enhanced I/M programs, Congress's intent was that they take effect on the same timeline as plans for their submission. Second, the commenter states that the EPA's reading undermines the limits on its discretion regarding subpart 2 of the Act, contrary to governing precedent. Third, the commenter claims that the EPA wrongly reads 40 CFR 51.373(d) as allowing implementation to take 4 years from the date of reclassification. Instead, the commenter notes that the regulation provides that the required Enhanced I/M Program "shall be fully implemented no later than 4 years after the effective date of designation and classification under the 8-hour ozone standard." The commenter believes that "the effective date of designation and classification" is not the same as the effective date of "reclassification" because designation and reclassification did not occur on the same date. The commenter notes that the same is true for Basic I/M. Finally, the commenter asserts that it is inherently unreasonable, arbitrary, and capricious for the EPA to allow an implementation deadline for I/M Programs that is later than the relevant area attainment dates because mobile source emission reductions are so important for reducing ambient ozone levels.

*Response:* We agree with the commenter that the I/M rule at 40 CFR 51.373(d) regarding the I/M implementation deadline is directly applicable only for areas initially designated and classified. But we do not agree that the EPA cannot consider that regulatory timeframe in adjusting schedules for implementation of newly applicable I/M programs following an area reclassification under CAA sections 182(i) and 301(a). While as a general matter, we agree that expeditious attainment of the NAAQS is best served by implementing control measures in advance of area attainment dates, and ideally in time to influence attainment by the attainment date, we are also cognizant that many, if not all, of the components of an I/M program permit consideration of feasibility within a given time frame. A list of these items that must be included in an I/M SIP is enumerated in 40 CFR 51.372(a). For example, establishment of the inspection network, the request for

proposal process to select an inspection hardware/software service provider, inspector recruitment, training and licensing, changes to the state's vehicle registration process, as well as public notification, outreach and education are components to an I/M program that, based on the experience of the EPA and implementing states, we know to be time-intensive and difficult to feasibly accomplish on an accelerated timeframe.

As discussed in the proposal, CAA section 182(i) specifically provides authority to the EPA to adjust applicable deadlines (other than attainment dates) for areas that are reclassified as a result of failure to attain under CAA section 182(b)(2), to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions. The EPA is establishing the same default I/M implementation deadline under its general rulemaking authority in CAA section 301(a), in the context of implementing subpart 2 planning requirements, for voluntarily reclassified areas. We acknowledge that for initially designated and classified areas, all of the submission and implementation deadlines in subpart 2 occur prior to the attainment deadline, and that ideally, states would similarly address all newly applicable subpart 2 requirements for reclassified areas in time to influence an area's air quality by the next attainment date. This is in large part why all of the other default deadlines for reclassified ozone areas in this action have been adjusted consistent with that approach.

We do not agree, however, that CAA section 182(i), or subpart 2 generally, explicitly prohibits the establishment of any deadline beyond the attainment date. Section 182(i) states that states containing reclassified areas shall meet the applicable subpart 2 requirements "according to the schedules prescribed in connection with such requirements" in granting the EPA discretion to adjust such deadlines other than the attainment date. The EPA's establishment of the default I/M implementation deadline of no later than 4 years after the effective date of reclassification is a limited exercise of its discretion under CAA section 182(i) to provide one deadline that extends beyond the attainment date. The Agency has a longstanding position that the statutory requirement for states to implement I/M in ozone nonattainment areas classified Moderate and higher generally exists independently from the attainment planning requirements for such areas, and specifically the

attainment date.[23] We note that the same commenter taking issue with the EPA's post-attainment date implementation deadline for I/M elsewhere argues that the EPA should establish RACT implementation deadlines "even if compliance timeframes extend beyond the applicable attainment year ozone season." [24]

We agree that given section 182(i)'s requirement that the EPA assure consistency among required submissions and the Act's overall emphasis that areas expeditiously attain the NAAQS, it would be unlawful for the EPA to adjust all submission and implementation deadlines for reclassified areas such that those deadlines fell after the newly applicable attainment dates. But the EPA's action here with respect to providing this limited I/M implementation extension for states that do not intend to rely upon emission reductions from their newly required Basic or Enhanced I/M program in attainment or RFP SIPs is not inconsistent with the Act's goal of attainment of the NAAQS; under the EPA's default deadlines, areas must still submit and implement all control measures necessary to achieve attainment by the attainment date no later than the beginning of the attainment year ozone season. The EPA's final action providing this limited extended I/M implementation deadline for certain reclassified ozone nonattainment areas also aligns with past practice for both mandatorily and voluntarily reclassified areas.[25] We do not dispute that mobile source emission reductions are an important component to reducing ambient ozone levels, but we do not agree with commenter that this fact necessarily renders the final default I/M implementation deadline of 4 years from the effective date of reclassification (for areas not relying on I/M reductions in attainment or RFP SIPs) to be "inherently unreasonable, arbitrary, and capricious." Emissions from mobile sources can be and are addressed under the CAA in other programs besides I/M, including Federal

---

[23] John S. Seitz, Memo, Reasonable Further Progress, Attainment Demonstration, and Related Requirements for Ozone Nonattainment Areas Meeting the Ozone National Ambient Air Quality Standard, May 10, 1995, at 4.

[24] EPA–HQ–OAR–2024–0333–0044 commenter letter at 13.

[25] *See, e.g.,* 87 FR 60897 (October 7, 2022) (establishing Basic I/M implementation deadlines for areas reclassified from Marginal to Moderate for the 2015 ozone NAAQS); 89 FR 51829 (June 20, 2024) (establishing Enhanced I/M implementation deadlines for certain Texas areas that were voluntarily reclassified from Moderate to Serious for the 2015 ozone NAAQS).

vehicle standards, and states may also seek ways to reduce and mitigate mobile source emissions consistent with the CAA in their plans to attain by the attainment date.

### B. Status of Certain Requirements of Former Classification

#### 1. Summary of Proposal

The EPA proposed regulations to codify its existing interpretation that, following reclassification to Moderate, Serious, or Severe, certain ozone SIP requirements for the lower, former classification will still be required. Specifically, the EPA restated its interpretation that ozone nonattainment area planning requirements continue to apply following a change in an area's classification level, except where the EPA has specifically determined that the planning requirement is no longer applicable. A state is no longer required to submit SIP revisions addressing the following requirements related to the prior classification level for an ozone nonattainment area: (1) for areas that are mandatorily or voluntarily reclassified, a demonstration of attainment by the prior attainment date; (2) for areas that are mandatorily or voluntarily reclassified, a RACM analysis tied to the prior attainment date; and (3) for areas that are voluntarily reclassified before the lower classification's attainment date, contingency measures specifically related to the area's failure to attain by the attainment date associated with the prior classification.

#### 2. Final Rule

The EPA is finalizing regulatory text in line with the Agency's position as described in the proposal. Planning requirements applicable to the lower, former classification for the ozone NAAQS [26] continue to be legally required following a change in an area's classification level, except: (1) the attainment demonstration; (2) RACM; and (3) for areas that are voluntarily reclassified, contingency measures to address failure to attain by the attainment date associated with the prior classification. Although the EPA's position is unchanged from proposal, the final regulatory text reflects minor changes from the proposed text. This includes minor changes based on comments, as noted in the next section. We also made minor revisions to the definitions of "former attainment date" and "former classification" to ensure clarity that former attainment dates and

former classifications include every classification assigned to an area before it was reclassified, not exclusively the immediately preceding classification (*e.g.,* an area initially classified as Moderate that was subsequently reclassified as Serious and then reclassified again as Severe remains legally responsible for requirements associated with Moderate and Serious classifications as outlined in this rule, in addition to the new requirements for Severe).

#### 3. Comments and Responses

*Comment:* Two commenters (0036, 0044) generally support the EPA's policy on leftover SIP requirements. One of these commenters (0036) believes that the EPA should finalize its proposal that most SIP requirements from an area's prior classification continue to apply following reclassification because these requirements include important, CAA-required ozone reduction programs, as well as requirements to demonstrate progress towards attainment. The commenter emphasizes that it is critical that states implement these programs in general, and implement these programs on the original deadlines. The other commenter (0044) states that the CAA does not allow reclassification to result in the elimination of unmet SIP requirements that do not depend on the superseded attainment deadline. The commenter believes that the proposed approach is not only reasonable, but compelled by the CAA's carefully constructed statutory scheme, which does not contemplate fewer or different requirements for reclassified areas when compared to those areas initially when designated nonattainment. To arrive at the contrary conclusion would allow areas struggling with ozone air pollution to skirt otherwise applicable SIP requirements, which would be unreconcilable with Congress's discretion-limiting intent in enacting the ozone nonattainment requirements.

*Response:* The EPA agrees with the commenters and is finalizing the deadlines as proposed with minor clarifications as discussed elsewhere in this document.

*Comment:* Two commenters (0041, 0042) assert that the EPA's policy on leftover SIP requirements is neither required nor supported by statutory provisions that the EPA cites in the proposed rule, and requests that the EPA reconsider the policy. One commenter (0041) states that the CAA section 182(i) does not give the EPA "gap filling" authority to specify what requirements apply to an area that has

been reclassified, and legislative history indicates that Congress did not intend for requirements of a former classification to apply upon reclassification to a higher classification. The commenter notes that the reference to submissions under CAA sections 182(b) and (c) contained in sections 182(c) and (d) make no mention of the situation where an area has been reclassified (and thus should not be interpreted to apply to a reclassification). Instead, the commenter believes that these provisions should be read to mean classifications under subpart 2 impose cumulative, but not what the commenter considers duplicative, requirements.

Two commenters (0037, 0042) believe that all requirements associated with an area's prior classification are superseded, and no longer due, with more stringent requirements upon reclassification to a higher classification. One of these commenters (0042) claims that requiring a state to submit and have the EPA act on superseded prior classification elements would make no logical or practical sense.

One commenter (0041) believes that the EPA's proposed distinction between SIP elements "inherently tied" to an attainment date and SIP elements "independent" of an attainment date is not supported by statute. The commenter asserts that, under the EPA's proposed statutory interpretation, requirements that are tied to attainment dates are transitory requirements that are supplanted if an area is reclassified to a higher level of nonattainment, while other requirements in CAA section 182 are effectively immutable and are not affected by a change in an area's classification. The commenter disagrees with the EPA's assertion that the SIP elements associated with an area's CAA section 181 classification are "generally cumulative from Marginal up to Extreme" and that "[t]he requirement to submit such elements remains applicable, and the submittal and implementation deadlines are unchanged." The commenter believes that a more rational reading of the statute is that reclassification resets not only the timing of attainment, but also which SIP requirements are applicable and the timeframe under which states and localities must satisfy such requirements. The commenter states that it is difficult to reconcile why an area initially designated as being in Moderate nonattainment (and then reclassified to Serious nonattainment) would be treated differently from an area initially designated as being in Serious nonattainment. The commenter

---

[26] The EPA's interpretation regarding leftover SIP requirements when an area has been reclassified is specific to the ozone NAAQS, and as codified in this final rule, does not apply to any other NAAQS.

further asserts that a straightforward reading of the provision indicates that: (1) reclassified areas are only subject to requirements that apply to them under a new classification (*i.e.*, requirements "as may be applicable to the area as reclassified"); and (2) the EPA's Administrator's authority pursuant to CAA section 182(i) is constrained to adjusting "applicable *deadlines*" and not "applicable *requirements*." The commenter asserts that this reading gives full force to the increasing burden placed on reclassified areas pursuant to subpart 2 but CAA section 182(i) does not grant the EPA Administrator authority to continue to impose requirements that have been superseded by more stringent requirements. Additionally, the commenter asserts that because reclassification (voluntary or mandatory) effectively increases the obligations imposed on states and localities to meet RFP and provide sufficient contingency measures, the commenter believes that the EPA's interpretation adds to that burden without appreciable benefit.

One commenter (0037) urges the EPA to conclude that a voluntary reclassification moots all leftover SIP elements from the previous classification and any sanctions, where applicable, associated with the failure to submit those elements for approval. The commenter believes that the CAA recognizes that a state can exercise its authority to request a voluntary reclassification, and therefore moot all elements required under the prior classification, because the purpose of the reclassification is to permit a state to take the most effective steps to achieve the NAAQS on the timeline laid out for the new classification. In addition, the commenter states that, even if the EPA holds to its position that these previous classification elements are not tied to the attainment deadline, the elements remain tied to the classification itself and change alongside it. The commenter further believes it is arbitrary and contrary to the CAA to impose requirements, or to continue potential sanctions where applicable, when the purported elements are associated with deadlines that have already passed for an area that will be subject to a more stringent classification. In addition, the commenter asserts that continuing to require elements associated with a lower classification places unnecessary burdens upon states and diverts resources from focusing on the requirements of the more stringent classification.

*Response:* The EPA disagrees with the commenters. The EPA's interpretation

of the CAA regarding what SIP requirements remain due following reclassification is supported by and consistent with the relevant statutory provisions and is the best interpretation of relevant CAA provisions. Subsections (b) through (d) of CAA section 182 cover the required SIP revisions for Moderate (182(b)), Serious (182(c)), and Severe (182(d)), and those requirements are generally cumulative. *See, e.g.,* CAA section 182(b) (requiring Moderate areas to make submissions relating to Marginal areas in addition to the revisions for the Moderate classification). In CAA section 182(i), the statutory language also indicates that the requirements of each classification are cumulative. The EPA interprets the provision "shall meet such requirements of subsections (b) through (d) . . . as may be applicable to the area reclassified" to require from a state any and all of the elements contained in subsections (b) through (d) that apply, not only the elements from subsection (b) or subsection (c) or subsection (d) in isolation. The state must meet requirements of subsections (b) through (d)—*i.e.,* subsection b, subsection c, *and* subsection d rather than subsection b, subsection c, *or* subsection d—that apply, and elements of multiple classifications may be applicable at any given point to the area being reclassified.

The commenter's characterization of the EPA's action as using section 182(i) to justify adjusting the requirements is misplaced. The EPA is not adjusting the requirements but rather providing clarity on what the requirements are. The EPA interprets the CAA such that when areas are reclassified to a higher classification of nonattainment, those areas will become responsible for the statutory duties imposed under the new classification and *remain* responsible for the statutory duties imposed under any prior, lower classifications that it was classified as, except for such elements inherently tied to the attainment date of the lower classification. The EPA disagrees with the commenter's claim that the CAA does not support the EPA's distinction between SIP elements "inherently tied" to an attainment date and SIP elements "independent" of an attainment date. To give sensible construction to the terms of the CAA and avoid an absurd result, common sense necessitates an exception for elements inherently tied to a date in the past. There is only one attainment date that applies at any given time to a singular nonattainment area for a given ozone NAAQS, and the CAA does not require attainment

demonstrations for attainment dates that are not applicable to the area. Because the former classification's attainment date is no longer applicable, it is therefore no longer relevant—and is indeed, impossible—for the area to demonstrate attainment with respect to it. As explained in more detail in a later comment response, this same logic applies to RACM. Similarly, there are no requirements to have contingency measures tied to the prior classification's attainment date in a situation where an area can never be found to have failed to attain by a no longer relevant attainment date.

The EPA does not entirely disagree with the commenter's characterization of the elements inherently tied to the attainment date as "transitory" but notes that these elements are time-bound in a manner unique to them in that once the attainment date has passed, those elements are, as a matter of logic, impossible to fulfill. No reading of the statute can alter the practical reality that once the attainment date has passed and an area has failed to attain, no steps can be taken by any State nor the EPA to demonstrate that an area would meet a factual scenario that did not come to pass, *i.e.,* attain the ozone NAAQS by the attainment date, when the area failed to attain by the attainment date. Similarly, after the attainment date, a RACM analysis can only be a null set of measures because it is impossible to advance an area's attainment by a year earlier than the attainment date after that attainment date has come and gone. With respect to voluntary reclassification, there is no purpose in requiring a state to have contingency measures that could never be triggered by failure to attain by an attainment date that no longer exists.[27] Similarly, a state cannot plan around meeting an attainment date that has been superseded. It is this characteristic—that these elements are impossible to fulfill—that distinguishes leftover SIP elements from the otherwise cumulative set of requirements enshrined in the CAA's ozone nonattainment classifications. It is an exception to avoid an absurd result.

---

[27] The term "triggered" for CMs refers to the EPA having made a final determination that requires implementation of the CMs, such as a final determination that a nonattainment area has failed to meet RFP or has failed to attain a NAAQS by the applicable attainment date. *See* Joseph Goffman, Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter, December 3, 2024, at 3, available at *https://www.epa.gov/air-quality-implementation-plans/final-contingency-measures-guidance.*

The EPA disagrees with the commenters that believe that all requirements associated with an area's prior classification should be superseded, or that by establishing the system of increasing levels of nonattainment (*i.e.,* classifications), Congress meant for the elements of the lower classification to become obsolete upon reclassification. The CAA provides no language suggesting that reclassification nullifies the statutory obligations imposed on a state under its former classification, and commenters provide no explanation of their perceived statutory argument to support a claim that the elements of the former classification are no longer required. Another commenter's assertion that because the EPA would not require elements of classifications lower than the area's initial classification (*e.g.,* for an area initially classified as Serious, requiring elements of Moderate areas), this means that continuing to require elements of lower classifications after an area has been reclassified imposes duplicative rather than cumulative requirements is similarly flawed. The mere fact that an area is reclassified is not a sufficient basis to determine that a CAA requirement imposed on the area under a prior classification no longer applies, and there is no language in the statute which necessitates or supports such a position. The commenters have not identified how the statutory language supports a finding that elements of each classification are additive yet not preserved upon reclassification.

Reclassification to a higher classification is not designed to halt progress toward achieving the NAAQS under the prior classification, but rather the opposite. Reclassification is an acknowledgment that an area needs additional time to attain the NAAQS, and that it needs to implement more stringent requirements and controls in order to attain. The cumulative requirements of each classification Congress specified in the Act—though necessitating a dedication of time and resources by states—provide an intentional, measurable pathway to attainment. The purpose of establishing plan requirements for ozone nonattainment areas is to establish and obligate states to take the most effective steps to achieve the NAAQS, which include all of those steps outlined in the sections of part D applicable to ozone from the least stringent associated with an area's initial classification to the most stringent associated with its highest classification.

While one commenter claims that requiring a state to submit and have the EPA act on superseded prior classification elements would make no logical or practical sense, to the contrary, Congress's choice to identify steps guiding states toward achieving attainment logically reflects its intent for each step to count. This is especially true given the requirement that EPA must reclassify areas with persistent nonattainment problems, with each successive reclassification resulting in requirements to adopt more rigorous SIP elements. Under the commenter's proposed reading, reclassification resets not only the timing of attainment and the degree of stringency of SIPs required, but also interrupts and resets—or in some cases cancels—the implementation of the requirements of the area's former classification. The steps Congress enshrined in the CAA as appropriate to achieve attainment would be obsolete, and areas that are further from achieving the CAA goal of maintaining ambient ozone levels below the threshold requisite to protect public health and welfare (*i.e.,* the primary and secondary ozone NAAQS) would be able to skip, or at least delay, steps that Congress directed them to take. For example, the Serious area RFP provisions begin in the 6th year after designation and establish milestones for 3 percent annual reductions for each 3-year period thereafter.[28] But the Moderate area RFP provisions require 15 percent reductions over the first 6 years after designation. Commenters' logic would make the Moderate requirement obsolete upon reclassification to Serious, resulting in an interpretation that 15% reductions were no longer required for the first 6 years the area was nonattainment; only the Serious area requirement would apply starting in the 7th year. Clearly this is not consistent with the language or purpose of the RFP provisions of the statute, which are intended to avoid this kind of delay in reductions, and this example demonstrates how the commenter's assertion that such submissions are "duplicative" is flawed.

Under such a reading, it would be fully possible for a state to elude duties imposed on them under the CAA by waiting until the attainment date has nearly passed, requesting a voluntary reclassification, and waiting for the next attainment date to request an additional voluntary reclassification without planning for, making, or demonstrating meaningful progress toward achieving the NAAQS. Congress could not have intended to render the NAAQS and the steps it prescribed to achieve the NAAQS wholly irrelevant with such a loophole. Introducing new requirements (*e.g.,* requiring an area initially classified as Serious to submit elements of Moderate areas) is clearly distinct from enforcing *existing* requirements. The CAA does not relieve a state of its existing requirements upon reclassification, with the exception of elements inherently tied to the attainment date for the reasons described elsewhere in this document. Under the EPA's interpretation, states remain obligated to address requirements associated with the lower classifications to which they were assigned even following voluntary reclassification, with the limited exception of elements directly tied to the attainment date. The consequences associated with failure to submit elements of a lower classification remain unchanged upon voluntary reclassification with the limited exception of elements directly tied to the attainment date.

With respect to the comment asserting that a voluntary reclassification should moot any sanctions associated with a failure to submit the SIP elements associated with a prior classification, the EPA agrees only with respect to the leftover SIP elements that we consider to no longer be required submissions after a voluntary or mandatory reclassification, as applicable. Pursuant to CAA section 179(a)(1)–(2), a finding of failure to submit or final disapproval of a SIP submission required under part D, title I of the CAA triggers the imposition of sanctions under CAA section 179(b). *See also* 40 CFR 52.31. Similarly, a finding of failure to submit or final disapproval of a required SIP submission triggers the EPA's obligation to promulgate a Federal Implementation Plan (FIP) under CAA section 110(c)(1)(B).

Accordingly, if there is currently a FIP and sanctions clock associated with either (1) a finding of failure to submit, or (2) a prior disapproval of a, SIP submission that is no longer considered to be a required submission due to an intervening reclassification, the EPA would consider the reclassification action to moot the FIP and sanctions clocks. Similarly, if the EPA disapproves a SIP submission that is no longer considered to be a required submission due to an intervening reclassification, there would be no FIP or sanctions clock associated with a disapproval of that submission.[29] In

---

[28] CAA section 182(c)(2)(B) for Serious area provisions and section 182(b)(1) for Moderate provisions.

[29] CAA section 110(k) requires that the EPA act on any submitted SIP revision, regardless of
Continued

other words, because a state no longer has a legal obligation to submit the relevant SIP submissions that are no longer required for the reasons described in this action, the failure to submit or disapproval of such submissions would not trigger imposition of mandatory sanctions under CAA section 179 and 40 CFR 52.31, or a FIP obligation under CAA section 110(c).

*Comment:* Four commenters (0036, 0037, 0038, 0039) agree with the EPA's position on leftover SIP requirements regarding attainment demonstrations and RACM. However, one commenter (0044) disagrees with the EPA's position on leftover SIP requirements related to RACM and urges the EPA not to finalize its proposal that reclassification of a nonattainment area, whether by mandatory or voluntary reclassification, excuses the states' obligation to adopt all RACM for the previous classification. The commenter claims that the plain language of the CAA establishes RACM as a mandatory part of each nonattainment plan, and expressly requires that each nonattainment plan implement all RACM. In addition, the commenter states that the text and structure of the CAA make clear that the requirement to adopt all RACM is in addition to, and independent from, the requirement to provide for timely attainment and there is nothing in the text of the statute suggesting that the requirement to impose all RACM is predicated on any particular attainment deadline. Furthermore, to the extent that the EPA believes that RACM is tied to an attainment date, or only relevant if such measures can "advance attainment date by 1 year," the commenter believes that the EPA has failed to articulate how that rationale is consistent with the plain text of the CAA. Finally, the commenter claims that the CAA's paramount purpose of protecting public health supports ensuring that reclassified areas continue to implement all RACM as expeditiously as practicable, regardless of any new attainment deadline. Excusing reclassified areas from the CAA's RACM requirements creates a perverse incentive for states to simply request reclassification or run out the attainment deadline clock, thereby avoiding any need to evaluate or impose reasonable pollution reduction measures.

*Response:* The EPA agrees with the commenter that the states are required

to submit SIPs addressing RACM for all nonattainment areas classified as Moderate and above. *See* 40 CFR 51.1312(c). The EPA further agrees that this requirement to adopt all RACM is in addition to, and independent from, the requirement to submit a SIP revision that includes a demonstration that the SIP will, as revised, provide for attainment of the NAAQS by the applicable attainment date. However, the EPA disagrees that there is nothing connecting the CAA requirement to impose all RACM with the relevant attainment deadline.

As explained in the proposal, in a RACM demonstration a state must show whether there are any reasonably available control measures that could advance an area's attainment date beyond the control strategy associated with the accompanying attainment demonstration. *See, e.g.,* 80 FR 12264, 12282 (March 6, 2015) (interpreting the Clean Air Act "to require a demonstration that the state has adopted all reasonable measures . . . to meet RFP requirements and to demonstrate attainment as expeditiously as practicable and thus that no additional measures that are reasonable available will advance the attainment date of contribute to RFP for the area."). The Clean Air Act mandates that SIP submittals must "provide for the implementation of all reasonably available control measures as expeditiously as practicable . . . and shall provide for attainment of the [NAAQS]." 42 U.S.C. 7502(c)(1). Given this inextricable link to advancing attainment beyond what is included in the attainment demonstrations, the EPA's rules require that states address RACM as part of their SIP submittal demonstrating that the nonattainment area at issue will attain the ozone NAAQS no later than the applicable attainment date. *See, e.g.,* 40 CFR 51.1312(c) (requiring that "the state shall submit with the attainment demonstration a SIP revision demonstrating that it has adopted all RACM necessary to demonstrate attainment as expeditiously as practicable and to meet any RFP requirements."). While the commenter possibly disagrees with the EPA's longstanding interpretation of RACM, in the current rulemaking, the EPA is not reopening its ozone implementation regulations or the interpretations of nonattainment planning requirements contained therein.

The EPA's interpretation of RACM is longstanding. For example, the EPA wrote in the General Preamble, dated April 16, 1992, that states should consider all candidate measures that are

potentially available for the particular nonattainment area that could advance the attainment date by 1 year.[30] The EPA similarly explained in a 1979 rule the interpretation that RACM should be implemented "insofar as necessary to assure reasonable further progress and attainment by the required date." [31]

Thus, when this interpretation of RACM is applied to the situation at issue in this rule, the outcomes are clear. For a mandatory reclassification, where the former classification's attainment date is in the past and was not met, it is not possible or meaningful for a state or the EPA to consider whether control measures could advance attainment earlier than the already past attainment date. Similarly, following voluntary reclassification of an area, there is no sense in assessing whether a former attainment date could have been met sooner. In either case, if a state were to submit a RACM analysis for the lower classification, that analysis would be tailored to the already-passed or former attainment deadline for the lower classification. When a state submits a SIP containing an attainment demonstration and RACM prior to the attainment date, the Act is clear about what the EPA must do. The EPA must determine whether the state has demonstrated that the area will attain by the *applicable* attainment date and whether the state has adopted all reasonable measures that would advance that date. However, this is not appropriate when the applicable attainment date has already come and gone—or has moved following a voluntary reclassification.

In this scenario, states are not avoiding being held accountable under the Clean Air Act. For areas that fail to attain and are mandatorily reclassified, states must implement contingency measures for failure to attain by the attainment date. In all situations, while reclassification allows states time to submit a RACM analysis with respect to the new classification level, the new classification imposes added, more stringent obligations on the state.

If the EPA were to require a state to submit a RACM analysis for the former classification after an area is reclassified, it would lead to one of two illogical outcomes. One possibility is that the state would be required to submit a RACM analysis pertaining to an already passed or already supplanted attainment date. Such submissions

whether the submission is considered to be required to meet applicable CAA requirements. A state may withdraw a SIP submission, and then EPA considers there to be no remaining obligation to act on that SIP revision.

[30] State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990, Proposed Rule, 57 FR 13507 (April 16, 1992).

[31] 44 FR 20372, 20375 (April 4, 1979).

would not support the goals of the Act and would have no beneficial impact on nonattainment areas' success in attaining by or advancing the no longer relevant attainment date. As already discussed, a RACM analysis is intended to determine what measures can reasonably be adopted to advance the attainment date, but such an attainment date cannot be advanced once an area has failed to attain, or the attainment date no longer exists. The alternative is that a RACM analysis is required for the former classification level, but it would be an analysis conducted with respect to the new applicable attainment date for the higher classification level. This would then require the state to submit a RACM analysis with its lower classification plan, due by a lower classification deadline, but analyzing a brand-new attainment date. States are already required to submit a RACM analysis with respect to the higher classification level and for the higher classification attainment date. The EPA has declined to follow either of these approaches.

Accordingly, following reclassification, a RACM analysis must be done with respect to the new and currently applicable attainment date. The CAA does not require RACM analysis for attainment dates associated with any classification that is not currently applicable to the area.

*Comment:* One commenter (0042) disagrees with the EPA's assertion that RACT requirements are not tied to the attainment date and therefore are not mooted for a prior classification upon reclassification. The commenter contends that because CAA section 182(b)(2)(A) requires that states implement RACT for all categories of sources covered by a CTG document issued before the date of attainment, there is a clear statutory connection of the RACT review to the attainment date. The commenter argues that because the EPA sets RACT implementation deadlines based on the attainment year, this evidences that EPA bases RACT requirements on the attainment deadline. The commenter also notes that because higher classification levels have a lower major source threshold for RACT, RACT SIP submissions for a higher classification level would necessarily cover RACT determinations for a lower classification level, thus eliminating the need for a submittal to address RACT for the prior classification.

*Response:* The EPA disagrees with the commenter. For reclassified areas, the RACT requirements at 40 CFR 51.1312(a)(2)(ii) and (3)(ii) obligate a state to conduct a new, individual RACT analysis for the new classification and implement any identified measures as necessary. Reclassification does not relieve the RACT obligation for the prior classification. The CAA requirement in section 182(b)(2) to implement RACT for specified categories of sources is implemented and assessed based on whether the RACT rules are implementing what is economically and technologically feasible and is not based on reductions needed to attain by the attainment deadline.

We disagree that CAA section 182(b)(2)(A) provides a statutory connection of RACT to the attainment date. Section 182(b)(2)(A) states that RACT requirements apply to each category of sources covered by a CTG document issued by the Administrator between November 15, 1990, "and the date of attainment." This language establishes the sources covered by the RACT analysis that a Moderate or higher area must consider. The reference to the attainment date sets an outer bound of what CTGs will define the categories of sources that fall under the Moderate RACT requirement. It does not tie the substantive RACT analysis, and the level of controls required by the application of RACT, to the attainment date.

We also disagree that the stationary source threshold set by the classification level evidences a connection between RACT and the attainment date. Just as 182(b)(2)(A) defines the categories of sources that need to be covered by a RACT assessment so too the stationary source threshold associated with a classification level defines the sources that need to be covered in the state's RACT assessment. The stationary source threshold establishes the emission levels where RACT would be applied but does not define the substance or content of the RACT analysis. For example, for an area reclassified from Moderate to Serious, the prior Moderate classification would require evaluation of any sources in any category subject to a CTG and any non-CTG sources with a potential to emit more than 100 tons per year (tpy) of $NO_X$ or VOCs. The commenter is correct in that the new Serious classification means the state needs to address RACT for additional sources, namely non-CTG sources with a potential to emit 50 tpy or more of $NO_X$. But the commenter has failed to explain why this fact—that RACT must be analyzed and implemented for additional smaller sources—should, upon reclassification, result in delayed implementation of RACT for the original set of sources covered by the prior classification. If the EPA were to adopt such an interpretation, it would delay the implementation of RACT for several years in an area that is not attaining the ozone NAAQS, as each successive reclassification halts the submission and/or implementation of (as well as EPA action on) the RACT requirement as it applied to the former classification. This would lead to a delay in required controls in areas that have air quality that exceeds levels protective of human health and the environment, particularly when compared to an area that was initially classified at the higher level, where technologically and economically feasible controls would be implemented by January 1 of the 5th year following designation as nonattainment. The commenter has not identified any language in the CAA that necessitates or even supports such a result.

Finally, the commenters point to the fact that the EPA has based RACT implementation deadlines on the timing required to influence attainment of the standard by the attainment date. This is a correct characterization of several, although not all, of the EPA's actions, but also does not inevitably lead to an interpretation that required SIP revisions and RACT implementation should be delayed by several years following an area's reclassification. As explained, the substantive analysis required in a RACT SIP, namely the implementation of controls that are economically and technologically feasible, does not hinge on what level of control is needed for the area's attainment by the attainment date (this is in contrast to, *e.g.,* the analysis required for RACM). A state's RACT SIP should be based on, and the EPA will review it for, imposition of reasonably available control technology, even if that imposition of reasonably available control technology is not nearly enough to get the area to attainment by the attainment date. At the same time, it is also true that implementation of RACT-level control should aid, at least in part, in getting an area to attainment by the attainment date. Accordingly, both of these things can be true: that RACT is not a requirement directly tied to the attainment date while also requiring that RACT SIPs be due and RACT-level controls be implemented in time to matter for the overall efforts to get an area to attainment.

*Comment:* Three commenters (0037, 0038, 0039) agree with the EPA's position on leftover SIP requirements regarding contingency measures for failure to attain. However, two commenters (0030, 0044) disagree with the EPA's proposal insofar as it does not require contingency measures for areas that request and receive voluntary

reclassification before the attainment date. They recommend that the EPA continue to require contingency measures for failure to attain for such areas, to be implemented when states request voluntary reclassifications prior to the attainment date.

One commenter (0030) notes that requiring contingency measures for failure to attain for states that request a voluntary reclassification will ensure they are not just extending their SIP submission and implementation deadlines, and claims that allowing such an extension would promote prolonged periods of nonattainment for ozone and negatively impact health. This commenter also cautions that the EPA should be wary of states who request a reclassification as a means to delay such deadlines.

Similarly, another commenter (0044) disagrees with the EPA's position that, for voluntary reclassifications that are effective before the attainment date, contingency measures are not triggered because the EPA is not required to make a determination of whether the area attained by its attainment date. The commenter asserts that the plain language of the CAA provides that contingency measures are triggered if the area did not attain by its attainment date, not whether the EPA made a finding of such, and the fact that the EPA will not make such a determination is not relevant. The commenter further asserts that, if a voluntary reclassification becomes effective after the attainment date, the EPA similarly has no authority to remove the requirement to have contingency measures because CAA sections 172(c)(9) and 182(c)(9) do not say that contingency measures are triggered after the EPA "determines" or "makes a finding." The commenter also notes that if the reclassification occurs before but becomes effective after the attainment date, then the previous classification attainment date applied on the effective date because the area was still that previous classification on that date. The commenter recommends, at a minimum, that the EPA should change the word "occurred" to "became effective" in proposed 40 CFR 51.1403(a)(3) because before the rule granting the voluntary bump up request becomes effective, the applicable attainment date is for the lower classification. Lastly, the commenter takes issue with the EPA's statement in the proposal that "Requiring a state to submit or the EPA to act on such SIP elements would make no logical or practical sense," and asserts that it is both practical and logical for the EPA to require contingency measures to be implemented following a reclassification.

On the contrary, one commenter (0036) urges the EPA to not require contingency measures for failure to attain as a leftover SIP requirement after any reclassification (voluntary or mandatory). The commenter believes that the EPA's justification for requiring these contingency measures only for mandatory reclassifications by attempting to draw a clear distinction between two scenarios is flawed. Under the first scenario, a state requests a voluntary reclassification after its attainment year, but before its attainment date, and, under the second scenario, a state waits to have the EPA take its mandatory action to reclassify the area, which occurs after the attainment date has passed. The commenter asserts that while these situations would appear to be very different, they are both based on the recognition that the area's attainment year ozone data shows that the area will not attain the NAAQS, which is publicly available in uncertified form no later than December 31 of the attainment year and, in certified form, by May 1 of the following year. Both the uncertified and certified data are available well in advance of the attainment dates of the 2015 ozone NAAQS. In other words, both situations are predicated on the recognition that the area will fail to attain the standard by its attainment date, whether this failure to attain has been officially acknowledged by the EPA through a mandatory finding, or not. The commenter claims that, because these situations are identical in practice, there should be no difference in how the contingency measure requirement for failure to attain applies.

*Response:* The EPA disagrees with the commenters' contention that the Agency should implement contingency measures for failure to attain when states request voluntary reclassifications before the prior classification's attainment date has passed. Considering the case where the state requests, and the EPA approves, a reclassification before the attainment date, there would be no trigger for the implementation of contingency measures where there is no finding of failure to attain because the applicable attainment date has changed. When the area is voluntarily reclassified before the attainment date, the EPA is no longer required to—and cannot—determine whether the area attained by the former attainment date. Once voluntarily reclassified, the area no longer has the attainment date associated with the prior classification level. Because the EPA would not—and could not—issue a finding of failure to attain with respect to the prior, no longer existing attainment date, requiring a state to submit contingency measures for failure to attain by the attainment date associated with the previous classification would no longer have logical significance because such measures could not be triggered. With respect to the commenter's related assertion that contingency measures should be triggered by something other than the EPA's issuance of a finding of failure to attain (*i.e.,* by the voluntary reclassification itself), this is contrary to the EPA's longstanding interpretation of what triggers the requirement to implement contingency measures.[32] As articulated in a number of finding of failure to attain actions, the EPA's determination of a failure to attain triggers the requirement to implement contingency measures.[33] States have full discretion to request voluntary reclassification for any reason, and there is no statutory basis to require states to implement contingency measures based on such a request. However, reclassification does trigger the requirement to submit new contingency measures for failure to attain by the new classification's attainment date. States are also still required to have contingency measures available to implement in the event the area fails to meet any RFP milestone associated with the current of former classification.

The EPA agrees with the commenter that the effective date of the voluntary reclassification is governing with respect to whether contingency measures for failure to attain by the previous attainment date are required. If a voluntary reclassification becomes effective after the attainment date associated with the lower classification level, the EPA would be obligated to determine whether the nonattainment area attained by the attainment date associated with the prior, lower classification. In such a case, states would be required to implement contingency measures for any failure to attain by the attainment date associated with the prior classification level. Therefore, the EPA has adjusted the regulations finalized herein as commenter suggested, specifically changing the word "occurred" to "became effective" in 40 CFR 51.1403(a)(3).

---

[32] *See* Joseph Goffman, Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter, December 3, 2024, at 3, available at *https://www.epa.gov/air-quality-implementation-plans/final-contingency-measures-guidance.*

[33] *See, e.g.,* 87 FR 21825, 21828 (April 13, 2022).

The EPA disagrees with the commenter that contingency measures for failure to attain should not be required for an area that has, in fact, failed to attain the ozone NAAQS by the applicable attainment date and was subsequently reclassified. Such a result is directly contrary to the plain text of the CAA. CAA section 172(c)(9) requires that states provide, as part of their SIPs, "implementation of specific measures to be undertaken if the area fails . . . to attain the [primary NAAQS] by the attainment date." [34] It is the direct effect of the CAA text that states are required to have contingency measures that can be implemented when an area has failed to attain the NAAQS by the area's attainment date. It would be directly contrary to the statute to determine that such contingency measures are not required for an area that meets this exact fact pattern. The EPA disagrees with the commenter's premise that voluntary and mandatory reclassifications should be treated the same because they are situated the same factually, specifically that voluntary reclassifications are always requested based on data that shows an area will not attain by the applicable attainment date. Voluntary reclassifications are provided as a result of a state's request, and the state does not need to request reclassification based on data indicating an area may not attain by the applicable attainment date; it has full discretion to request such a reclassification at any time, including in advance of such data becoming available. CAA section 181(b)(3) states that "[t]he Administrator shall grant the request of any State to reclassify a nonattainment area in that State . . . to a higher classification." The grant of voluntary reclassification is not premised upon any particular reasoning as to why the state may request reclassification, and there is no statutory basis for the EPA to require contingency measures tied to a failure to attain to be triggered based on such a request.

*Comment:* One commenter (0041) recommends that the EPA treat RFP requirements and contingency measures for RFP in the same manner as RACM and contingency measures related to a failure to attain because such requirements are related to attainment of the ozone NAAQS. The commenter states that RFP reductions are linked to attainment because CAA section 182(b)(1)(A) refers to RFP reductions as being "necessary to attain the national primary ambient air quality standard." In addition, the commenter asserts that it would be entirely illogical for

Congress to impose requirements on states through subpart 2 that were not, in some fashion, directly or indirectly linked to attainment of air quality standards.

*Response:* The EPA agrees that all subpart 2 requirements are related, in some fashion, to areas' attainment of the ozone NAAQS, but commenters' assertions that RFP is directly tied to the attainment date is inconsistent with the RFP requirements established in the implementing regulations for the 2015 ozone NAAQS and the EPA's longstanding interpretation of RFP for ozone nonattainment areas.

Moderate and higher ozone nonattainment areas are subject to the general requirements for nonattainment plans in CAA subpart 1 and the specific requirements for ozone areas in CAA subpart 2, including the requirements related to RFP and attainment. While CAA section 172(c)(2) of subpart 1 states only that nonattainment plans "shall require reasonable further progress," CAA sections 182(b)(1) and 182(c)(2)(B) of subpart 2 provide specific percent reduction targets for ozone nonattainment areas to meet the RFP requirement. Put another way, subpart 2 defines RFP for ozone nonattainment areas by specifying the incremental amount of emissions reduction required by set dates for those areas.[35] Importantly, these set dates are independent of the attainment date. Although the dates may coincide with a particular attainment date, the required RFP date(s) associated with the lower classification do not change when the attainment date changes as a result of reclassification. For Moderate ozone nonattainment areas, CAA section 182(b)(1) defines RFP by setting a specific 15 percent VOC reduction requirement over the first 6 years of the plan. The 15 percent reduction is "the base program that all Moderate and above areas must meet. This base program is necessary to ensure actual progress toward attainment in the face of uncertainties inherent with SIP planning." [36]

For Serious or higher ozone nonattainment areas, the 15 percent

requirement still applies, and section 182(c)(2)(B) further requires specific annual percent reductions for the period following the first 6-year period and allows averaging over a 3-year period. With respect to the 1-hour ozone NAAQS, the EPA has stated that, by meeting the specific percent reduction requirements in CAA sections 182(b)(1) and 182(c)(2)(B), the state will also satisfy the general RFP requirements of section 172(c)(2) for the time period discussed.[37]

The EPA has adapted the RFP requirements under the CAA to implement the three 8-hour ozone NAAQS that have been promulgated since the 1990 CAA Amendments. In the "Phase 2" SIP Requirements Rule for the 1997 Ozone NAAQS (Phase 2 rule), *see* 70 FR 71612 (November 29, 2005), the EPA adapted the RFP requirements of CAA sections 172(c)(2) and 182(b)(1) to require plans to provide for the minimum required percent reductions and, for certain Moderate areas, to provide for the reductions as necessary for attainment.[38]

In 2015, the EPA replaced the regulations promulgated through the Phase 2 rule with the regulations promulgated through the 2008 Ozone SIP Requirements Rule (SRR). 80 FR 12264 (March 6, 2015).[39] In the 2008 Ozone SRR, the EPA established RFP requirements for the 2008 ozone NAAQS that are similar, in most respects, to those in the Phase 2 rule for the 1997 ozone NAAQS but that do not define RFP for certain Moderate areas in terms of the reductions needed for attainment by the attainment date.[40] More explicitly, in the 2008 Ozone SRR, the EPA defined RFP as meaning both the "emissions reductions required under CAA section 172(c)(2) which the EPA interprets to be an average 3 percent per year emissions reductions of either VOC or NOₓ and CAA sections 182(c)(2)(B) and (c)(2)(C) and the 15 percent reductions over the first 6 years of the plan and the following three percent per year average under 40 CFR 51.1110." *See* 40 CFR 51.1100(t). Thus, under the 2008 Ozone SRR, the RFP emissions reductions required for Serious or higher ozone nonattainment areas under CAA section 172(c)(2) are

---

[34] 42 U.S.C. 7502(c)(9).

[35] CAA section 171(1) defines RFP as "such annual incremental reductions in emissions of the relevant air pollutant as are required by this part or may reasonably be required by the Administrator for the purpose of ensuring attainment of the applicable national ambient air quality standard by the applicable date." The words "this part" in the statutory definition of RFP refer to part D of title I of the CAA, which contains the general requirements in subpart 1 and the pollutant-specific requirements in subparts 2–5 (including the ozone-specific RFP requirements in CAA sections 182(b)(1) and 182(c)(2)(B) for Serious areas).

[36] 57 FR 13498, 13507 (April 16, 1992).

[37] *See* 57 FR 13498, 13510 (April 16, 1992) (for Moderate areas), 13518 (for Serious areas).

[38] *See, e.g.,* 40 CFR 51.910(a)(1)(ii)(A), (b)(2)(ii)(C).

[39] Under 40 CFR 51.919 and 51.1119, the regulations promulgated in the 2008 ozone SRR replaced the regulations promulgated in the Phase 2 rule, with certain exceptions not relevant here.

[40] Compare RFP requirements for the 1997 ozone NAAQS at 40 CFR 51.910(a)(1)(ii)(A) and (b)(2)(ii)(C) with the analogous provisions for the 2008 ozone NAAQS at 40 CFR 51.1110(a)(2)(i)(B).

based on a set annual percentage found in the CAA, not on the specific needs for the area to attain by the attainment date. In this regard, the EPA has been even more explicit in our SRR for the 2015 ozone NAAQS: ''Reasonable further progress (RFP) means the emissions reductions required under CAA sections 172(c)(2), 182(c)(2)(B), 182(c)(2)(C), and 40 CFR 51.1310. The EPA interprets RFP under CAA section 172(c)(2) to be an average 3 percent per year emissions reduction of either VOC or $NO_X$ 40 CFR 51.1300(l).

Thus, the SRR for the 2015 ozone NAAQS defines RFP in terms of percent reduction from the area's emissions in the baseline year, not in terms of the reductions necessary for attainment by the attainment date. In other words, for the 2015 ozone NAAQS, the requirement to demonstrate RFP is independent of the requirement to demonstrate attainment by the attainment date. RFP for the 2015 ozone NAAQS represents the minimum progress that is required under the CAA and our regulations, and does not necessarily need to provide for the reductions necessary to achieve attainment of the ozone NAAQS by the attainment date, which could vary largely from one nonattainment area to another. For all of these reasons, the EPA disagrees with commenter's claim that RFP should be treated the same as the Moderate area attainment demonstration, RACM, and contingency measures for failure to attain. The EPA's explanation for why those three particular SIP elements are no longer required following a reclassification does not apply to the Moderate area RFP SIP element. Unlike the other three SIP elements, RFP is not directly tied to the applicable attainment deadline as explained earlier.

Moreover, the SRR for the 2015 ozone NAAQS lists RFP and ROP as distinct provisions for implementation.[41] These provisions clearly demonstrate the necessity for RFP reductions during the first 6 years of the plan, regardless of the area's initial classification, or whether it was Moderate before being reclassified as Serious, whether voluntarily, or mandatorily.

Because it is not appropriate after an area reclassification to treat RFP the same as the attainment demonstration, RACM, and contingency measures for failure to attain, it necessarily follows that contingency measures for failure to make RFP would also still be required for a failure to meet an RFP target associated with the lower classification

after reclassification. If it is appropriate to still require SIP submissions addressing RFP for the prior classification, then it follows that the EPA will require states to have contingency measures in place that would be triggered for failure to meet those RFP milestones.

*Comment:* One commenter (0042) urges the EPA to update its proposal to note that if states can demonstrate their RFP targets have been met for reclassified areas, the requirement to submit RFP contingency measures for the prior classification would be unnecessary.

*Response:* The EPA acknowledges that there may be certain unideal situations where the state has not yet submitted, or the EPA has not yet approved, contingency measures for the prior classification, but the state has nonetheless demonstrated that all RFP milestones associated with the prior classification have been met. Where the EPA has determined that demonstration to be adequate, the question of whether the state has adequate contingency measures for failure to meet RFP with respect to that milestone can be moot. This situation is unideal because the CAA is not designed to operate this way with respect to timing, and these situations typically arise because the state is overdue for submitting approvable contingency measures. Under normal CAA timelines, the contingency measures submittal and the EPA approval should occur before the RFP milestone arrives so that the contingency measures could be triggered if the area fails to meet RFP. States should not delay submittal of required contingency submittals in the hopes that they may become moot at a later time. Such an approach contravenes the statutory timelines established by the CAA, and the intent of the contingency measures requirement. If this situation arises and the RFP milestone is not met, the CAA requires implementation of contingency measures without further action by the state or the EPA. That requirement cannot be met on time if the contingency measures submittal is delayed.

However, under the unusual circumstances in which the EPA determines the prior classification's RFP reduction targets were met before the state makes its overdue submittal to satisfy the prior classification's requirement for contingency measures for failure to meet RFP, the EPA believes that no submittal of contingency measures for a potential failure to meet

the prior classification's RFP targets would be necessary.[42]

As discussed elsewhere in this document, with a voluntary reclassification there will be no possibility of failure to attain by the attainment date associated with the previous classification, and so the voluntary reclassification negates the need for contingency measures for failure to attain. Further, if a state has provided any applicable RFP demonstration(s) associated with the previous classification and the EPA has determined those demonstrations to be adequate, this would negate the need to submit the contingency measures for failure to meet the RFP milestones associated with the previous classification, thus resulting in mooting the previous classification's contingency measures requirement entirely.

*Comment:* One commenter (0036) recommends that the requirement to continue to address leftover SIP requirements from prior classifications should apply no matter if the reclassification is voluntary or mandatory. The commenter notes that, in this context, the method of reclassification makes no difference. The commenter claims that a state must also be prevented from repeatedly requesting a voluntary reclassification right before each attainment date, a strategy that would delay indefinitely, at least until Extreme classification is reached, the need for the state to submit any ozone SIP or implement any ozone control program. The commenter claims that this outcome is clearly contrary to the CAA and undermines the very purpose of having defined regulatory requirements for nonattainment areas.

*Response:* The EPA generally agrees with the commenter, and the EPA's interpretation regarding which SIP elements remain due related to a prior, lower classification level is largely consistent for voluntary and mandatory reclassifications. The only distinction between requirements that remain due for a voluntary versus mandatory reclassification is with respect to contingency measures to failure to attain. As explained in more detail in a prior response to comments, the EPA's distinction for the contingency measure requirement is appropriate given that in the context of a mandatory reclassification, a nonattainment area

---

[41] *See,* 40 CFR 51.1300(l), 51.1300(m), 51.1310(a)(2)(i) and 51.1310(a)(4)(i).

[42] The EPA notes that we articulated this position in a recent action. *See* 87 FR 67957, 67960 (October 3, 2023) (''EPA agrees with TCEQ that there is no longer a need for contingency measures triggered by failure to meet RFP for the DFW and HGB Serious nonattainment plan for purposes of the 2008 8-hour ozone NAAQS, because these areas met RFP for this specific classification.'').

has failed to attain by the attainment date, thereby triggering contingency measures for that failure to attain. This is completely distinguishable from a voluntary reclassification that becomes effective prior to a nonattainment area's attainment date, where that date is superseded and replaced by the new attainment date related to the new classification level.

The issue of how often and when a state may request a voluntary reclassification for a nonattainment area is beyond the scope of this action. The EPA takes separate actions, independent from this rule, in response to states' requests for voluntary reclassifications. The commenter may look to those actions for the EPA's position on the issue, and has the opportunity to seek judicial review of those actions if it disagrees with the EPA's approach.

*Comment:* One commenter (0042) asserts that, in cases where States satisfy certain required elements with the submittal of certification statements noting that the requirements have already been addressed (which is commonly used for addressing I/M and NNSR requirements), it is illogical to hold areas under a finding of failure to submit for elements that have already been submitted and approved under previous classifications or standards. The commenter feels that submittal of a certification statement is not legally necessary for the EPA to know that an element, upon which the EPA has already acted and approved, has been addressed, as the EPA's SIP approval actions legally stand on their own merit. In addition, the commenter notes that the infrastructure SIP submittal requirements for each NAAQS already provide certification from the state that existing regulations are adequate to meet the applicable nonattainment area planning requirements.

*Response:* The EPA understands the commenter as arguing that states should not be required to provide a SIP submission in instances where a state has previously provided, and the EPA approved, a SIP submittal addressing a SIP requirement for a lower classification or earlier ozone NAAQS. This comment is outside the scope of the rulemaking and therefore the comment is not substantively adverse to the action taken herein. As a result, a response to this comment is not required. Although this issue was not discussed in the proposal for this rule, the Agency notes that this issue has been addressed at length in previous rulemakings, including recently with relation to the 2015 ozone NAAQS. *See, e.g.,* 83 FR 62998, 63002. The Agency further notes that the commenter's

characterization that infrastructure SIP submittal requirements relate to nonattainment area planning requirements is incorrect. *See* Stephen D. Page, Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2), September 13, 2013, at 52, available at *https://www.epa.gov/sites/default/files/2015-12/documents/guidance_on_infrastructure_sip_elements_multipollutant_final_sept_2013.pdf* (explaining that the submission deadline for infrastructure SIPs under CAA section 110(a) do not apply to nonattainment areas, because SIP submissions for designated nonattainment areas "are subject to a different submission schedule than those for section 110 infrastructure elements").

*Comment:* One commenter (0044) notes that proposed 40 CFR 51.1403(a) mistakenly contains two paragraph 2's. The second, which begins "If the reclassification occurred prior to the former attainment date," should be adjusted to be paragraph 3.

*Response:* The EPA agrees with the commenter that the cited proposed regulatory text was a mistake, and the EPA has modified the final regulations to reflect the corrected numbering.

### C. Serious Area SIP Revisions for the 2015 Ozone NAAQS

#### 1. Summary of Proposal

The EPA proposed to apply its default deadlines to states with newly reclassified Serious areas under the 2015 ozone NAAQS. Those default deadlines, as applied to reclassified Serious areas under the 2015 ozone NAAQS, require such states to submit SIP revisions for those areas, including revisions for RACT needed to achieve attainment of the standards by the attainment date, no later than 18 months after the effective date of the relevant reclassification notice or January 1, 2026, whichever is sooner. The EPA also proposed that the default implementation deadlines for RACT and Enhanced I/M would apply to reclassified Serious areas under the 2015 ozone NAAQS. Thus, such areas would be required to implement RACT by no later than 18 months from the RACT submittal deadline or the beginning of the 2026 attainment year ozone season for that area, whichever is earlier. In addition, for states that do not intend to rely upon emission reductions from their Enhanced I/M program in attainment or RFP SIPs, we proposed to allow Enhanced I/M programs to be fully implemented no later than 4 years

after the effective date of reclassification.[43]

#### 2. Final Rule

The EPA is finalizing the default SIP submittal and implementation deadlines for reclassified ozone nonattainment areas as proposed, and thus such deadlines would apply to areas reclassified as Serious under the 2015 ozone NAAQS. Below we address comments regarding the proposed deadlines insofar as they specifically concerned the application of those deadlines to reclassified Serious areas under the 2015 ozone NAAQS.

#### 3. Comments and Responses

a. Due Date for Serious Area SIP Revisions and RACT Implementation

*Comment:* One commenter (0032) believes that the EPA's proposed default SIP submission deadlines are insufficient for nonattainment areas reclassified as Serious under the 2015 ozone NAAQS. The commenter notes that rulemaking to lower thresholds from 100 tpy to 50 tpy takes a substantial amount of time, and it is unreasonable to expect that newly regulated entities will be able to prepare a RACT SIP submittal, install controls, and come into compliance by January 1, 2026. In addition, the commenter believes that the proposed RACT implementation deadline is not realistic. Even if states currently have regulations ready, only a reclassification could trigger the requirement for RACT implementation, which the commenter believes will not occur until December 31, 2024, providing only 1 year to prepare a RACT study, install controls, and implement RACT. The commenter further provides that the EPA has not reclassified the areas, and many states have no authority to begin the arduous process of rulemaking until a Federal action triggers that requirement.

*Response:* The EPA acknowledges that the new Serious source threshold may present difficulties for some states in developing a RACT SIP submittal by January 1, 2026. However, as stated in the proposal, a SIP submission deadline of the earlier of 18 months from the effective date of reclassification or January 1, 2026 (January 1 of the attainment year) will allow Serious area control measures to influence attainment by the Serious area attainment date while also balancing the need for a consistent submission

---

[43] The EPA did not propose any changes to the implementation of any new Basic I/M programs, which are still required by the prior rule that reclassified certain nonattainment areas as Moderate for the 2015 ozone NAAQS. *See* 87 FR 60897, October 7, 2022, at 60900.

deadline among the various Serious area SIP requirements per CAA section 182(i). The outer boundary of January 1, 2026, for states to submit their Serious area SIP revisions applies equally across areas for which an 18-month deadline is not possible and ensures that the newly applicable subpart 2 requirements will be addressed consistent with part D's purpose of achieving expeditious attainment by the attainment date.

To the extent the commenter is concerned that regulated entities will not be able to install controls and come into compliance prior to January 1, 2026, the EPA notes that we proposed, and are finalizing, a RACT implementation deadline for any nonattainment areas reclassified as Serious under the 2015 NAAQS that provides for implementation as expeditiously as possible, but no later than 18 months from the RACT submission deadline or the beginning of the 2026 ozone season, whichever is earlier. For some nonattainment areas that will be reclassified as Serious in separate actions, the last ozone season that can impact air quality before the areas' attainment date begins in January of the attainment year and for other areas it begins in March of the attainment year. *See* 40 CFR part 58, appendix D, section 4.1, table D–3. By structuring the default deadlines as "the earlier of" an outside timeframe (*e.g.,* 18 months) or a specific date (*e.g.,* the beginning of the 2026 ozone season), the EPA is maximizing time for SIP development, adoption, and submission, while still ensuring that controls are adopted into the SIP and implemented in time to influence attainment of the NAAQS by the attainment date.

We acknowledge again that meeting this SIP submission deadline will be challenging for many states. However, to the extent that commenters suggested that states can only initiate SIP development activities only after the EPA finalizes its area reclassifications, we disagree. There are proactive and voluntary pathways by which states can anticipate and manage the tight timeframes to develop required SIP revisions for reclassified nonattainment areas, including early planning and voluntary reclassification. The EPA is aware that many states with areas affected by this current action may be constrained in finalizing rulemakings that require additional emissions controls unless the state air agency can demonstrate such controls were mandated by an underlying Federal requirement (*e.g.,* required pursuant to a mandatory area reclassification). However, to our knowledge, most states

with affected areas are not prohibited from starting their SIP development activities before the EPA finalizes this current action, particularly because all of those areas are already required under the CAA to attain the 2015 ozone NAAQS. As we noted in prior attainment determination and reclassification actions for the 2008 and 2015 ozone NAAQS, states with nonattainment areas that were proposed for reclassification had known with a reasonable amount of certainty that revised SIPs would be due in the near future to provide for expeditious attainment of the 2008 and 2015 ozone NAAQS, and had the opportunity to make progress on plan development activities before issuance of the final actions.[44] That remains true for this current action, where states with affected Moderate areas have been aware of preliminary 2021–2023 DVs since at least December 2023 and certified 2021–2023 DVs since May 2024, showing that the areas were not going to timely attain and would be reclassified under the CAA. These states, therefore, could have reasonably anticipated that SIP revisions for reclassified Serious areas would be due in the near future, consistent with the CAA and previous EPA determination and reclassification actions. Nonetheless, the EPA recognizes the challenges posed by the SIP submission and RACT implementation deadlines being finalized as part of this rule, and is committed to working closely with states to help them as they prepare SIP revisions in a timely manner.

*Comment:* One commenter (0036) recommends that the deadlines and requirements set by the EPA for 2015 ozone NAAQS areas reclassified to Serious should be consistent with those established by the EPA in its June 2024 Texas area reclassification rule (89 FR 51829, June 20, 2024). The commenter notes that many of the same issues and options in this proposed rule were also contemplated in the June 2024 rulemaking. The commenter further provides that aligning SIP deadlines and requirements would also benefit state attainment planning efforts by facilitating the use of area-agnostic technical products (such as attainment modeling and control measure analyses) and encouraging interstate attainment planning coordination.

*Response:* As commenter notes in its letter, the deadlines and requirements that the EPA is finalizing are consistent with those the EPA finalized in its June 2024 rule reclassifying three Texas areas

from Moderate to Serious under the 2015 ozone NAAQS.[45]

*Comment:* One commenter from Delaware (0033) requests that the EPA finalize a SIP submittal deadline of March 1, 2026, for Delaware's 2015 ozone NAAQS Serious attainment plan SIP. March 1, 2026, marks the beginning of Delaware's attainment year ozone season, and establishing a SIP submittal deadline that aligns with the attainment year ozone season will allow Delaware sufficient time to research and prepare a thorough and comprehensive SIP revision as well as time to complete the required SIP revision submittal process. The commenter further provides that March 1, 2026, is a more reasonable time frame because of Delaware's complex and lengthy regulatory process, lack of feedback from the EPA on contingency measures, and absence of resources available for Delaware to calculate contingency measure reductions.

Another commenter from Colorado (0040) requests that the EPA grant Colorado the flexibility to submit its Serious SIP revision sometime after February 15, 2026, or, in the alternative, allow Colorado to submit it as a provisional and non-binding submission that will automatically be converted to a final submission for final approval after February 15, 2026. The commenter notes that the EPA granted Colorado's request for voluntary reclassification from Moderate to Serious on July 24, 2024. The EPA's proposed default SIP submittal deadlines would require Colorado to submit its Serious SIP for the 2015 ozone NAAQS to the EPA no later than January 24, 2026. However, due to Colorado's legislative process and the late timing of the EPA's rule, the commenter will be unable to submit the necessary SIP revisions by the EPA's proposed deadline.

*Response:* In Section II.A. of the proposal, the EPA articulated that, "if these default deadlines are finalized as proposed, they will apply to any nonattainment areas that are reclassified as Serious under the 2015 ozone NAAQS for failing to attain the standard by the Moderate attainment date of August 3, 2024, *unless otherwise established in a separate notice-and-comment rulemaking*" (emphasis added). 89 FR 80833, 80834 (October 4, 2024). The EPA did not propose to establish different SIP submittal or implementation deadlines for any specific nonattainment areas. Any such adjustment would need to be done in a separate notice-and-comment rulemaking. Therefore, the SIP

---

[44] *See,* 84 FR 44238, 44246 (August 23, 2019); 87 FR 60897, 60909 (October 7, 2022).

[45] 89 FR 51829 (June 20, 2024).

submission deadline that will apply to all nonattainment areas reclassified as Serious under the 2015 ozone NAAQS, including areas within Delaware and Colorado, will be the earlier of 18 months from the effective date of reclassification or January 1, 2026, unless otherwise established in a future notice-and-comment rulemaking.

In the case of Delaware, the EPA granted the state's request for a voluntary reclassification of the Philadelphia-Wilmington-Atlantic City, Pennsylvania-New Jersey-Maryland-Delaware 2015 ozone nonattainment area to Serious, which became effective on July 30, 2024. In applying the "earlier of" structure of the default deadlines finalized in this rule, January 1, 2026 (*i.e.,* January 1 of the attainment year) will be the SIP submission deadline for the states in which the Philadelphia-Wilmington-Atlantic City nonattainment area lies because that date occurs before the 18-month timeframe established by the effective date of the reclassification notice (*i.e.,* January 30, 2026).

Likewise, in the case of Colorado, the SIP submission deadline will be January 1, 2026. The EPA granted the state's request for voluntary reclassification of the Denver Metro/North Front Range 2015 ozone nonattainment area to Serious, which became effective on July 24, 2024. In applying the "earlier of" structure of the default deadlines finalized in this rulemaking, January 1, 2026 (*i.e.,* January 1 of the attainment year) will be the SIP submission deadline for Colorado because that date occurs before the 18-month timeframe established by the effective date of the reclassification notice (*i.e.,* January 24, 2026).

### b. Deadline for Serious Area I/M Implementation

*Comment:* One commenter (0042) disagrees with the EPA's proposal that it is necessary to establish an implementation date at the beginning of the attainment year ozone season for an Enhanced I/M program under the Serious classification to use the emissions reductions toward meeting Serious classification attainment demonstration and RFP requirements. The commenter believes that the EPA has not provided a rationale for why newly required Enhanced I/M programs for the 2015 ozone standard would have to be fully implemented by no later than the beginning of the Serious attainment year ozone season. The commenter asserts that implementation should not be required by the start date of the attainment year ozone season for the area for the reductions to be used,

particularly since emissions reductions from I/M programs are variable, depend on the number of vehicles tested in each month, as well as the vehicles' emissions profiles and state of repair.

*Response:* We disagree with the commenter's position that the EPA has not provided a rationale for why Enhanced I/M program emission reductions that will be relied upon by the states for attainment demonstration or RFP requirements must be implemented by the beginning of the attainment year ozone season. For Serious areas that intend to rely upon emission reductions from their newly required Enhanced I/M program for attainment and RFP purposes, the implementation deadline is already prescribed by the 2015 ozone implementation rule which requires all control measures (including I/M) in the attainment plan and demonstration to be implemented no later than the beginning of the attainment year ozone season.[46] As the EPA explained in the preamble, EPA's proposal and solicitation of comments as to reclassified Serious areas was limited to the deadline for implementation of Enhanced I/M for areas that were not intending to rely on reductions from those programs in attainment or RFP SIPs. *See* 89 FR 80850 (October 4, 2024).

## IV. Environmental Justice Considerations

In this action, the EPA is stablishing default SIP deadlines for submission of SIP revisions and implementation of the related control requirements for nonattainment areas reclassified as Moderate, Serious, and Severe for current and future ozone NAAQS. In addition, the EPA is codifying its existing interpretation that following reclassification, a state is no longer required to submit SIP revisions addressing certain requirements related to the prior classification level for an ozone nonattainment area. The EPA is also articulating how the default deadlines and codification of applicable requirements following reclassification would apply to nonattainment areas reclassified as Serious under the 2015 ozone NAAQS. This action is intended to comply with the CAA program to ensure that affected air agencies comply with CAA obligations for the applicable nonattainment areas.

As explained in the proposal, it is difficult to assess the environmental justice (EJ) implications of this action because the EPA cannot geographically identify or quantify resulting source-specific emission reductions. However,

due to the nature of this action, the EPA believes that it will likely have no adverse impact on any existing disproportionate and adverse effects on communities with EJ concerns. At a minimum, the EPA believes that this action will not worsen any existing air quality and is expected to ensure that the areas affected by the rulemaking will meet applicable requirements to attain and/or maintain national air quality standards.

The EPA reiterates, however, that states have flexibility and discretion under the CAA in implementing their attainment strategies to focus resources on controlling those sources of emissions that directly and adversely affect communities with EJ concerns. As stated in the proposal, the EPA strongly urges states to consider the EJ aspects of any control measures in order to provide health protection for communities with EJ concerns. In addition, the EPA strongly encourages states to work with communities experiencing EJ concerns to develop ozone-related control strategies that most effectively reduce emissions contributing to elevated ozone levels. One way to do this would be for states to increase opportunities for meaningful involvement of community groups during their SIP development processes.

The EPA has resources available to help air agencies consider aspects of EJ in their SIP development processes. The EPA released *EPA Legal Tools to Advance Environmental Justice (EJ Legal Tools)* in 2022 to highlight the various environmental and civil rights law authorities available to the EPA that authorize or address consideration of EJ in its decision-making process as it pertains to environmental laws, including the CAA.[47] *EJ Legal Tools* is also intended to promote meaningful engagement among the EPA and communities.[48] In addition, on September 5, 2024, the EPA announced the release of the final policy, "*Achieving Health and Environmental Protection Through EPA's Meaningful Engagement Policy.*"[49] This final policy updates the EPA's 2003 Public Involvement Policy that guides the EPA's staff to provide meaningful public involvement in all its programs and regions.[50]

---

[46] 40 CFR 51.1308(d).

[47] U.S. EPA, EPA Legal Tools to Advance Environmental Justice (May 2022).

[48] *Id.*

[49] U.S. EPA, Achieving Health and Environmental Protection Through EPA's Meaningful Engagement Policy (August 2024).

[50] *See* U.S. EPA, Public Involvement Policy of the U.S. Environmental Protection Agency (May 2003).

## V. Judicial Review

The CAA regulations promulgated herein may be challenged in the United States Court of Appeals for the District of Columbia Circuit. Pursuant to section 307(b)(1) of the CAA, petitions for judicial review of the CAA regulations must be filed in that court within 60 days after the date notice of this final action is published in the **Federal Register**. Section 307(b)(1) of the CAA provides, in part, that petitions for review must be filed in the United States Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect."

The CAA regulations promulgated herein are "nationally applicable regulations" within the meaning of CAA section 307(b)(1). These regulations establish regulatory requirements for all applicable areas across the entire United States to implement provisions of the CAA, including regulations establishing SIP submission and implementation deadlines for all newly reclassified ozone nonattainment areas nationwide, and. regulations codifying which requirements related to the prior classification level for an ozone nonattainment area are no longer applicable after an area's reclassification. Accordingly, under section 307(b)(1) of the CAA, petitions for judicial review of these CAA regulations must be filed in the United States Court of Appeals for the District of Columbia by March 18, 2025.

## VI. Severability

This final rule includes new and revised requirements for numerous provisions under the implementation regulations for the national ambient air quality standards for ozone, including deadlines for revisions of implementation plans addressing different statutory requirements of the CAA, deadlines for implementation of different control measures required under different provisions of the CAA, and regulations clarifying statutory provisions associated with an area's former classification that are no longer applicable to that area after the effective date of an area's reclassification. Therefore, this final rule is a multifaceted rule that addresses many separate things for independent reasons, as detailed in each respective portion of this preamble. We intend each portion of this rule to be severable from each other, though we took the approach of including all the parts in one rulemaking rather than promulgating multiple rules to ensure the changes are properly coordinated, even though the changes are not interdependent.

For example, although we address both deadlines for newly applicable requirements for reclassified areas and clarifications regarding which statutory requirements are no longer applicable for reclassified areas, these two sets of regulatory provisions are not interdependent and were issued concurrently in this action for administrative efficiency and clarity to impacted jurisdictions (*i.e.*, states) because both sets of provisions pertain to reclassified ozone nonattainment areas. Furthermore, the deadlines established under each regulatory provision are severable from the others because each deadline is set with consideration of the separate statutory authority governing the applicable requirement. Therefore, the EPA's rationale for establishing the deadline for revisions addressing a penalty fee program for Severe areas is distinct from its rationale for establishing the deadline for revisions addressing other newly applicable requirements. Similarly, the considerations of particular statutory programs provide the foundation for control measure implementation deadlines such that these deadlines are severable from one another. Finally, the provisions codifying the EPA's position regarding which requirements remain due following a reclassification are independent in statutory basis and reasoning from all other provisions in this rule, and therefore are severable from the remaining provisions in this rule. Further, the basis upon which the EPA determined whether each element remained due (*e.g.*, RACT, RFP) or no longer due (attainment demonstrations, RACM, and some contingency measures in some instances) was based on reasoning individualized to the SIP requirement, and therefore any judicial determination of the status of an individual SIP requirement is severable for a determination of any other planning element.

Thus, the EPA has independently considered and adopted each of these portions of the final rule and each is severable should there be judicial review. If a court were to invalidate any one of these elements of the final rule, we intend the remainder of this action to remain effective, as we have designed these regulations to function concurrently but independently from one another even if one or more other parts of the rule has been set aside. For example, if a reviewing court were to invalidate any of the deadlines governing newly applicable requirements for reclassified ozone areas, we intend other regulatory amendments, including non-related deadlines and clarifications about requirements that are no longer applicable, to remain effective. Moreover, this list is not intended to be exhaustive, and should not be viewed as an intention by the EPA to consider other parts of the rule not explicitly listed here as not severable from other parts of the rule.

## VII. Statutory and Executive Order Reviews

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review

This action is not a significant regulatory action as defined by Executive Order 12866, as amended by Executive Order 14094, and was therefore not subject to a requirement for Executive Order 12866 review.

### B. Paperwork Reduction Act (PRA)

This final rule does not impose any new information collection burden under the PRA not already approved by the Office of Management and Budget (OMB). This action establishes deadlines for submission of required SIP revisions and implementation of the related control requirements for newly reclassified Moderate, Serious, and Severe ozone nonattainment areas. This action also codifies the EPA's existing interpretation that following reclassification, a state is no longer required to submit SIP revisions addressing certain requirements related to the prior classification level for an ozone nonattainment area. Thus, the final action does not impose any new information collection burden under the PRA. OMB has previously approved the EPA's information collection activities contained in the existing regulations and has assigned OMB control number 2060–0695.[51]

[51] On April 30, 2018, the OMB approved the EPA's request for renewal of the previously approved information collection request (ICR). The renewed request expired on April 30, 2021, 3 years after the approval date (*see* OMB Control Number 2060–0695 and ICR Reference Number 201801–2060–003 for EPA ICR No. 2347.03). On April 30, 2021, the OMB published the final 30-day document (86 FR 22959) for the ICR renewal titled "Implementation of the 8-Hour National Ambient Air Quality Standards for Ozone (Renewal)" (*see* OMB Control Number 2060–0695 and ICR Reference No: 202104–2060–004 for EPA ICR Number 2347.04). The ICR renewal was approved on February 1, 2022, and the renewed request expires on January 31, 2025.

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. The SIP submittal and implementation deadlines, and the policy discussion outlining the EPA's interpretation of the status of certain requirements for prior nonattainment classifications following reclassification, do not in and of themselves create any new requirements beyond what is mandated by the CAA. Instead, this rule is administrative in nature, and does not directly regulate any entities.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain an unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. The division of responsibility between the Federal Government and the States for purposes of implementing the NAAQS is established under the CAA.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have Tribal implications, as specified in Executive Order 13175. This action will not impose substantial direct costs upon the Tribes, nor will it preempt Tribal law. The CAA requires SIP revisions for all nonattainment areas that are reclassified from a lower classification to a higher classification. For nonattainment areas that include portions of Indian reservation lands, the implementation plan deadlines that apply to States do not directly apply to Tribes. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may

disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive Order. Therefore, this action is not subject to Executive Order 13045 because it does not directly concern an environmental health risk or safety risk. Since this action does not directly concern human health, the EPA's policy on Children's Health also does not apply.

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer Advancement Act (NTTAA)*

This rule does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All*

The EPA believes that the human health or environmental conditions that exist prior to this action have the potential to result in disproportionate and adverse human health or environmental effects on communities with EJ concerns. The EPA believes that this action is not likely to change existing disproportionate and adverse effects on communities with EJ concerns. The areas impacted by this action are designated as nonattainment for one or more ozone NAAQS and this action is intended to comply with the CAA program to ensure attainment and maintenance of the NAAQS. From a programmatic perspective, this action is intended to ensure that affected air agencies comply with CAA obligations for the applicable nonattainment areas.

The EPA did not perform an EJ analysis and did not consider EJ as a basis for this action. While it is difficult to assess the EJ implications of this action because the EPA cannot geographically identify or quantify resulting source-specific emission reductions that are ultimately determined by air agencies, the EPA believes that this action is likely to have no impact on any existing disproportionate and adverse effects on communities with EJ concerns. Further, there is no information in the record inconsistent with the stated goals of Executive Orders 12898 or 14096.

*K. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

List of Subjects in 40 CFR Part 51

Environmental protection, Administrative practice and procedure, Air pollution control, Designations and classifications, Intergovernmental relations, Nitrogen oxides, Ozone, Reporting and recordkeeping requirements, and Volatile organic compounds.

**Joseph Goffman,**
*Principal Deputy Assistant Administrator, Office of Air and Radiation.*

For the reasons stated in the preamble, the EPA is amending Title 40, Chapter I of the Code of Federal Regulations as follows:

PART 51—REQUIREMENTS FOR PREPARATION, ADOPTION, AND SUBMITTAL OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 51 continues to read as follows:

**Authority:** 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

Subpart CC—Provisions for Implementation of the 2015 Ozone National Ambient Air Quality Standards

§ 51.1312   [Amended]

■ 2. Amend § 51.1312 by removing and reserving paragraphs (a)(2)(ii) and (a)(3)(ii).
■ 3. Add subpart DD consisting of §§ 51.1400 through 51.1403 to part 51 to read as follows:

Subpart DD–Requirements for Reclassified Ozone Nonattainment Areas

Sec.
51.1400   Definitions.
51.1401   Applicability of part 51.
51.1402   SIP submission and control measure implementation deadlines for reclassified ozone nonattainment areas.
51.1403   Applicability of ozone SIP requirements for former classification after reclassification.

§ 51.1400   Definitions.

The following definitions apply for purposes of this subpart. Any term not defined herein shall have the meaning as defined in § 51.100.

*Attainment year* means the calendar year in which the attainment year ozone season occurs.

*Attainment year ozone season* means the full ozone season immediately preceding a nonattainment area's maximum attainment date.

*CAA* means the Clean Air Act as codified at 42 U.S.C. 7401–7671q (2010).

*Former attainment date* means any attainment date associated with the classification under subpart 2 of part D of title I of the CAA preceding reclassification from a lower classification to a higher classification.

*Former classification* means any classification under subpart 2 of part D of title I of the CAA preceding reclassification from a lower classification to a higher classification.

*Higher classification/lower classification* means for purposes of determining which classifications are higher or lower, the classifications are ranked from lowest to highest as follows: Marginal; Moderate; Serious; Severe-15; Severe-17; and Extreme.

*I/M* refers to the inspection and maintenance programs for in-use vehicles required under the 1990 CAA Amendments and defined by subpart S of 40 CFR part 51.

*Initially classified* means the first nonattainment classification that becomes effective for an area for a specific ozone NAAQS and does not include reclassification to another classification for that specific NAAQS.

*Initially designated* means the first designation to nonattainment that becomes effective for an area for a specific ozone NAAQS.

*Ozone season* means for each state (or portion of a state), the ozone monitoring season as defined in 40 CFR part 58, appendix D, section 4.1(i) for that state (or portion of a state).

### § 51.1401 Applicability of part 51.

The provisions in subparts A through Y, AA, and CC of this part apply to reclassified nonattainment areas for purposes of the ozone NAAQS to the extent they are not inconsistent with the provisions of this subpart.

### § 51.1402 SIP submission and control measure implementation deadlines for reclassified ozone nonattainment areas.

(a) Deadlines for applicable requirements pursuant to a reclassification as Moderate, Serious, or Severe that are 18 months or more after the effective date of reclassification will apply to such reclassified area as though the area were initially designated at that classification.

(b) Deadlines for applicable requirements pursuant to a reclassification as Moderate, Serious, or Severe, where the deadline that would

have applied had the area been initially classified at the new classification level at the time of initial nonattainment area designations is less than 18 months after the effective date of reclassification.

(1) *SIP submission deadlines.* (i) For all SIP revisions required pursuant to reclassification (except SIPs addressing CAA section 185 fee programs), the SIP revision deadline is 18 months after the effective date of the relevant reclassification or January 1 of the attainment year, whichever is earlier, unless the Administrator establishes a different deadline in a separate action.

(ii) For SIP revisions addressing CAA section 185 fee programs required pursuant to reclassification, the SIP revision deadline is 36 months after the effective date of the relevant reclassification or January 1 of the attainment year, whichever is earlier, unless the Administrator establishes a different deadline in a separate action.

(2) *Control measure implementation deadlines.* (i) For RACT required pursuant to reclassification, the state shall provide for implementation of such RACT as expeditiously as practicable, but no later than 18 months after the RACT SIP submittal deadline or the beginning of the attainment year ozone season associated with the area's new attainment deadline, whichever is earlier, unless the Administrator establishes a different deadline in a separate action.

(ii) For the required I/M program pursuant to reclassification, the state shall provide for full implementation of such I/M program as expeditiously as practicable, but no later than 4 years after the effective date of the relevant reclassification, unless the I/M program is needed for attainment by the attainment date or RFP, in which case the state shall provide for full implementation of such I/M program no later than the beginning of the attainment year ozone season.

### § 51.1403 Applicability of ozone SIP requirements for former classification after reclassification.

(a) Upon the effective date of reclassification, the requirements of any subpart of this part with respect to ozone nonattainment planning applicable to the area for the former classification shall apply as follows:

(1) Unless specified in paragraph (a)(2) or (3) of this section, the requirement is unaffected by reclassification and continues to be required for the former classification.

(2) The following requirements are no longer applicable with respect to the former attainment date:

(i) A SIP revision to demonstrate attainment by such date.

(ii) A SIP revision demonstrating adoption of all RACM necessary to demonstrate attainment with respect to such date.

(3) If the reclassification became effective prior to the former attainment date pursuant to CAA section 181(b)(3), the plan requirement for contingency measures for failure to attain by such date is no longer applicable with respect to the former attainment date.

(b) Nothing in this section shall affect the requirements applicable to the nonattainment area under its currently applicable classification and attainment date.

[FR Doc. 2025–00336 Filed 1–16–25; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R10–OAR–2024–0511; FRL–12384–01–R10]**

### Air Plan Approval; AK; Updates to Materials Incorporated by Reference

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; administrative change.

---

**SUMMARY:** The Environmental Protection Agency (EPA) is updating the materials that are incorporated by reference (IBR) into the Alaska State Implementation Plan (SIP). The regulations affected by this update have been previously submitted by the State of Alaska and approved by the EPA. In this final rule, the EPA is also notifying the public of corrections and clarifying changes in the Code of Federal Regulations tables that identify the materials incorporated by reference into the Alaska SIP. This update affects the materials that are available for public inspection at the National Archives and Records Administration and the EPA Regional Office.

**DATES:** Effective January 17, 2025.

**ADDRESSES:** The SIP materials for which incorporation by reference into 40 CFR part 52 is finalized through this action are available for inspection at the following locations: Environmental Protection Agency, Region 10, 1200 Sixth Avenue, Suite 155, Seattle, WA 98101; and *www.regulations.gov*. To view the materials at the Region 10 Office, the EPA requests that you email the contact listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection. The Regional